STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JAMES
I. HUNT, DEFENDANT–APPELLANT.

Argued January 19, 1988—Decided June 9, 1989.

332

336

338

Mark H. *Friedman* and *Claudia Van Wyk*, Assistant Deputy Public Defenders, argued the cause for appellant (*Alfred A. Slocum*, Public Defender, attorney).

*Catherine A. Foddai*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

Defendant, James I. Hunt, was convicted by a jury of murder and sentenced to death. He filed a direct appeal challenging both the conviction and the sentence. *R.* 2:2–1(a)(3). We affirm defendant's conviction for murder, but we reverse the imposition of the death penalty.

We hold that in the penalty phase the trial court failed to instruct the jury that it must be convinced beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. *State v. Biegenwald*, 106 *N.J.* 13, 63–67 (1987) (*Biegenwald II*). Additionally, the charge on the aggravating factor described in *N.J.S.A.* 2C:11–3c(4)(c) (subsequently described as section "c(4)(c)") erroneously directed the jury to determine whether defendant's conduct was "outrageously or wantonly

vile, horrible or inhuman," and not whether it "involved torture, depravity of mind, or an aggravated battery to the victim." *See State v. Ramseur*, 106 *N.J.* 123 (1987). Finally, the trial court failed to determine, contrary to *N.J.S.A.* 2C:11-3b, if the jury had reached a final verdict when it advised the court that it could not agree on the imposition of the death penalty. Because the jury may have been unable to agree that defendant should be put to death, he may not again be subjected to the death penalty. Consequently, we remand the matter to the Law Division for the imposition of a non-capital sentence pursuant to *N.J.S.A.* 2C:11-3b. In light of our determination that defendant may not be subject to the death penalty, we find to be harmless error the trial court's failure to instruct the jury that it must find that defendant knowingly or purposely caused death and not that he intended to cause serious bodily harm resulting in death. *See State v. Gerald*, 113 *N.J.* 40, 69 (1988).

–I–

## FACTS

During the morning of December 2, 1982, the victim, Edward Lawson, and Charlotte Hunt were watching television in their sixth-floor apartment at 306 Cooper Street, Camden. Charlotte Hunt was defendant's sister, as well as Lawson's live-in companion and the mother of his infant son. Around 12:30 p.m., Lawson, who had taken some prescribed medication, fell asleep.

About this time, Harold Hunt, defendant's cousin, left his apartment located at 311 Cooper Street, across the street from Lawson's apartment. Harold was crossing the street when co-defendant, Kenneth Thompson, attempted to speak with him about Charlotte, whom Thompson believed to be Harold's sister. Harold informed Thompson that Charlotte was his cousin, not his sister, and then shouted to defendant, who was living in Harold's second-floor apartment. Defendant left the apartment and joined Harold and Thompson. Harold left, and Thompson, who apparently had never before met defendant, told him that

Charlotte had been looking for defendant three days earlier on November 29, 1982, because Lawson had beaten her.

Defendant asked Thompson to go to Charlotte's apartment and ask her if she would leave to talk to defendant. While Thompson went upstairs to get Charlotte, defendant returned to his apartment and entered the kitchen, where Patricia Fennell, Harold Hunt's live-in girl friend, was preparing food. Defendant opened the dresser in which Fennell kept her cooking utensils and grabbed a silver knife. According to Fennell, as defendant grabbed the knife, he said, "I told this motherfucker about fucking with my sister." From the kitchen, Fennell saw defendant run across the street to 306 Cooper Street, where Charlotte and Lawson lived.

Fennell rushed across the street, and on reaching the sixth floor, saw Thompson holding a knife and heard him say to defendant, "[c]ome on Man, we got to go. I'm going on up here and do what I got to do." Defendant replied, "I know what I got to do." Fennell, who also heard Thompson complain that Lawson had refused to sell him valium, attempted to defuse the situation by telling defendant that Charlotte would return to Lawson no matter what happened. Charlotte, who had left her apartment, joined the group in the hallway. On noticing his sister's broken lip, defendant expressed anger about Lawson's abuse of her. At this point, Fennell left, realizing that she could not dissuade defendant. Shortly thereafter, about 2:00 p.m., defendant and Thompson pushed their way into Charlotte's apartment and told her to leave. She pleaded with them to leave Lawson alone because he was still groggy and unable to defend himself. Nevertheless, defendant and Thompson awakened Lawson and began to scuffle with him. Charlotte unsuccessfully yelled at them to stop and threatened to call the police. As she grabbed her baby and fled for help, Charlotte saw defendant with a knife in his hand moving toward Lawson, whom Thompson was holding.

Approximately one half-hour later, at about 2:30 p.m., Lucille Taylor, Thompson's live-in girl friend, was watching television in the bedroom of their fourth-floor apartment at 306 Cooper Street when Hunt burst into the room, followed by Thompson. When defendant entered the room, he was holding a knife. Taylor noticed blood all over Hunt's clothing, his face and hands, as well as the knife. At one point, defendant exclaimed, "I killed him. I broke the knife in him." Thompson told Taylor to get some clean clothes for defendant and some trash bags. According to a statement Taylor made to the police on December 2, after defendant left the room and entered the bathroom to clean up and change his clothes, Thompson said "he [as if referring to himself] just killed a nigger."

After both defendant and Thompson had changed their clothes and washed themselves, they put their blood-stained clothes and knives into trash bags. According to Taylor's statement, Thompson threw his bag onto the roof of the building next to 306 Cooper Street, and Hunt threw his bag into a dumpster behind the apartment building.

In the interim, at approximately 2:10 p.m., Charlotte had found the building manager, Willie Hannah, who called the police and then ran upstairs to Lawson's apartment, where he found Lawson slumped behind the bathroom door. When the emergency medical team arrived at approximately 2:30 p.m., Hannah left Lawson's apartment and discovered Charlotte in the hallway crying hysterically. In response to Hannah's questioning, Charlotte initially said that four men had beaten Lawson, but she later admitted that defendant and Thompson were the assailants.

When the emergency medical technicians located Lawson's body behind the bathroom door, it was still warm but showed no vital signs. The technicians noted multiple stab wounds on Lawson's body. Blood frothing from his mouth indicated internal bleeding. The technicians also found about one and one-half pints of blood in a baby bathtub near Lawson.

The pathologist who performed the autopsy, Dr. Catherman, testified that the cause of death was loss of blood due to multiple stab wounds. Although Dr. Catherman could not determine how long it took for Lawson to bleed to death, he suggested a period of ten to twenty minutes, depending on the rapidity of Lawson's heartbeat, which would have determined how rapidly he lost blood.

The following day, when the police and a representative of the Camden County Prosecutor's Office returned to 306 Cooper Street, Taylor led them to the roof and to the dumpster. They found the bag containing Thompson's clothing on the roof and defendant's clothing in the dumpster. The police also recovered two knives and one handle.

## Indictment

Two months later, on February 17, 1983, defendant and Thompson were indicted for Lawson's murder and other offenses. A superseding indictment charged both defendants with the following offenses: knowing murder, contrary to *N.J.S.A.* 2C:11–3(a)(2); conspiracy to commit murder, contrary to *N.J.S.A.* 2C:5–2; hindering the apprehension or prosecution of each other, contrary to *N.J.S.A.* 2C:29–3(a)(3); unlawfully entering Lawson's apartment for the purpose of committing an offense therein, contrary to *N.J.S.A.* 2C:18–2; and possessing a weapon, a knife, for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4d. Both defendants were also charged with committing knowing murder by their own conduct, contrary to *N.J.S.A.* 2C:11–3(a)(2).

The court denied as unnecessary the defendants' and prosecution's motions for an order precluding peremptory challenges based on race. Also, the court denied defendants' motions requiring attorney-conducted *voir dire*, objecting to death qualifying the jury, requesting dismissal of the indictment because of the alleged unconstitutionality of the death penalty, and requesting that aggravating factor c(4)(c) be stricken as uncon-

stitutionally vague. In response to another defense motion, the court reserved ruling on the admissibility of Thompson's out-of-court statement implicating defendant, and later denied defendant's motion for a severance of his trial from Thompson's. Subsequently, the court ruled that evidence relating to a prior stabbing incident between defendant and Lawson would be admissible pursuant to *Evidence Rule* 55, to establish motive or intent. The court also denied defendant's motion for more information why aggravating factor c(4)(c) applied to his case. Finally, the court denied defendant's motion to dismiss the charge of hindering Thompson's apprehension, as well as the State's motion to amend the indictment to charge defendant and Thompson with hindering their own apprehension, contrary to *N.J.S.A.* 2C:29–3b.

## Trial

Defendant and Thompson were tried jointly in a trial that lasted from January 23 through February 15, 1984. The trial court employed a struck-jury system and preliminarily qualified fifty-two jurors, ten of whom were excused by the defendants and twelve by the prosecution.

### 1. Guilt Phase

The trial testimony generally supported the previously-mentioned facts. On its case, the State produced fifteen witnesses, including Willie Hannah, Patricia Fennell, Lucille Taylor, and Charlotte Hunt. Charlotte's testimony conflicted with her prior statements under oath to the police. She denied that defendant and Thompson pushed their way into her apartment and that defendant approached Lawson with a knife in his hand. Her statements to the police, therefore, were admitted into evidence under *Evidence Rule* 63(1)(a) as prior inconsistent statements.

Taylor testified that while defendant was in her apartment's bathroom changing his clothes, Thompson said to her, "this nigger just killed a nigger on the sixth floor." This testimony

conflicted with her prior statement to the police, in which she stated that Thompson, as if referring to himself, had said that "he just killed a nigger." At trial, Taylor insisted that "he" referred not to Thompson but to defendant. Thompson, who entered into an agreement with the State in which he pled to non-capital murder, testified as a rebuttal witness for the State. Thompson testified that after unsuccessfully trying to stop defendant, he saw defendant stab Lawson to death.

Patricia Fennell testified that in October 1982, approximately two months before the murder, she witnessed an argument between Lawson and defendant, in which defendant accused Lawson of beating Charlotte. According to Fennell, Lawson reached into his pocket, and defendant responded by stabbing Lawson in the left arm.

Through expert testimony, the State established that there were twenty-four knife wounds on the victim, that some of the wounds were consistent with the use of the knife that defendant had taken from Fennell's apartment, and that others were consistent with the knife Thompson had been seen holding. An enzyme analysis of the blood stains on defendant's clothing revealed that the blood was neither defendant's nor Thompson's, and that there was only a one in 13,000 chance that it came from someone other than Lawson.

In his defense, the defendant denied killing Lawson. Testifying on his own behalf, defendant admitted appearing at Lawson's apartment with a knife, but claimed that Fennell dissuaded him from confronting Lawson. Instead, according to defendant's testimony, he dropped the knife, left the apartment, and went to buy a beer.

In summation, defense counsel argued in the alternative that defendant had not killed Lawson, and even if the evidence established beyond a reasonable doubt that defendant had killed Lawson, the evidence established reasonable provocation, and therefore defendant should be convicted only of manslaughter. Specifically, the defense argued that defendant was

reasonably angered immediately prior to the homicide when he learned from Thompson that Lawson had been beating his sister, information that was confirmed by bruises on Charlotte's face.

The jury returned a verdict convicting defendant on all counts, including murder by his own conduct.

## 2. Sentencing Phase

Defendant sought to prove four mitigating factors: first, that he was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution, N.J.S.A. 2C:11–3c(5)(a); second, his age, twenty-two, at the time of the murder, N.J.S.A. 2C:11–3c(5)(c); third, that he had no significant history of prior criminal activity, N.J.S.A. 2C:11–3c(5)(f); and fourth, that he was devoted to his family, had an extensive work history, and that other factors relevant to his character, record, and the circumstances of the offense were such as to mitigate the imposition of the death penalty, N.J.S.A. 2C:11–3c(5)(h).

In support of those mitigating factors, defendant, his brother, and his mother testified that he was devoted to his family and was a reliable worker. A psychologist, Dr. Jerome Platt, testified in support of defendant's assertion that he was under extreme mental or emotional disturbance at the time of the offense. Dr. Platt recited that defendant has a limited intellectual capacity and suffers from a personality disorder that causes him to explode and strike out blindly in uncontrolled rage when he feels his family is threatened.

To support its request for the imposition of the death penalty, the State relied solely on aggravating factor c(4)(c). The State relied on the evidence adduced during the guilt phase and offered no additional proof on the penalty phase.

In its charge on aggravating factor c(4)(c), the court instructed the jury that it must "unanimously be convinced beyond a reasonable doubt that this murder involved torture or conduct

by the defendant which indicated a depraved mind." The court further charged the jury that if it did not unanimously find that the mitigating factors outweighed the aggravating factor, defendant would be sentenced to death. Following a conference with counsel, the court emphasized that it was important for the jury to attempt to reach a unanimous verdict.

The jury retired at 10:51 a.m., and at 2:45 p.m. sent a note to the trial court indicating it could not reach a unanimous decision on balancing the mitigating factors with the sole aggravating factor. After discussing the note with counsel, the trial court sent a note to the jury stating, "I've received your question. Please continue with your deliberations." At 4:35 p.m., the jury reached a verdict, finding that aggravating factor c(4)(c) and all four of the mitigating factors existed. Further, the jury found that the mitigating factors did not outweigh the aggravating factor. Accordingly, the court sentenced the defendant to death. See *N.J.S.A.* 2C:11–3c(3)(b).

–II–

## PRE–TRIAL ISSUES

A. Voir Dire

1. *Attorney–Conducted Voir Dire*

■ Initially, defendant contends that the convictions should be reversed because the trial court's refusal to permit attorney-conducted *voir dire* violated defendant's right to an impartial jury, to freedom from cruel and unusual punishment, and to due process of law. We rejected this argument in *Biegenwald II, supra,* 106 *N.J.* at 29–30.

■ Defendant argues that in *Biegenwald II* we did not adequately consider social science research allegedly demonstrating that a judge-conducted *voir dire* is inadequate to produce an impartial jury. We remain unpersuaded, however, that attorney-conducted *voir dire* is constitutionally required.

In this case, the trial court solicited questions from counsel and included most of the questions submitted by defense counsel in the questionnaire distributed to each potential juror. Moreover, after completing the initial questioning of each juror, the court asked counsel whether they wanted it to ask further questions. In many instances, the court accepted counsel's suggestions and conducted further questioning of the jurors. We find no reason to disturb the procedure followed by the court.

## 2. *The Overall Adequacy of Voir Dire*

Defendant next argues that even if the trial court was not constitutionally required to permit attorney-conducted *voir dire*, its questioning of the jurors was so inadequate as to violate defendant's federal and state constitutional rights to a fair trial. We disagree.

An impartial jury is, of course, a necessary condition to a fair trial, and a *voir dire* designed to expose potential bias is essential to ensure an impartial jury. *State v. Williams (Williams II)*, 113 *N.J.* 393 (1988). Generally, moreover, an appellate court should defer to the trial court's decisions about the *voir dire*. *Id.* at 410; *State v. Singletary*, 80 *N.J.* 55, 62–64 (1979).

In the instant case, before seating or questioning a potential juror, the court required each juror to complete a questionnaire outlining his or her occupation, as well as familiarity with the case, experience with the criminal justice system, and prior relationship with any of the participants. Before commencing the individual questioning, the court instructed the panel about the presumption of innocence and the general structure of a bifurcated capital trial. The court then conducted the *voir dire* on the basis of the responses to the written questions. Next, the court questioned each juror on his or her opinion of the death penalty. Finally, the court asked the juror whether or not he or she believed that every murder is outrageously or wantonly vile, horrible, or inhumane, and whether or not the

juror believed that evidence of a prior criminal conviction suggested that a defendant was guilty of the offense with which he or she was charged. The court then asked counsel to propose further questions, and submitted many of the proposed questions to the jurors.

To support the claim that the trial court's *voir dire* was inadequate, defendant points to the questioning of three jurors: Gerald Siefring, Julius DiGiacomo, and Ethel Brush. Defendant claims that the court did not sufficiently interrogate juror Siefring, a former postal inspector, about his prior relationship with possible police witnesses or about his relationship with his brother, who is a patrolman with the Delaware River Port Authority, or his uncle, who is a detective with the Camden County Prosecutor's Office. In response to a question from the court, Siefring stated that he would more readily believe the police officers whom he knew. On further probing, however, the juror stated that he would evaluate the facts objectively and not necessarily give the police the benefit of the doubt. The juror also stated that the fact his brother and uncle worked in law enforcement would not subject him to pressure to find the defendants guilty. Finally, the juror indicated that he had met the prosecutor once about six or seven years ago when the prosecutor was investigating a mail fraud case. On further questioning, however, he indicated these facts would not affect his ability to determine the matter fairly.

■ After the court finished questioning juror Siefring, Hunt's defense counsel stated that he had no objection to the juror being preliminarily qualified. Thompson's attorney, however, unsuccessfully objected to the juror for cause. Defendant now points to the response by the trial court as indicative that the court improperly believed it could not reject the juror's claim of impartiality:

THE COURT: All right. Well, the Court is not willing to make a judgment as to whether this person is telling the truth. And you will look at the facts from your point of view. The prosecutor is looking at them from another point of view. My point of view is whether I can rule as a matter of law that he was not

a proper juror. And based upon that which is expressed upon that record, I do not conclude that I can so rule. Of course, that is the reason that we have the peremptory challenge, and I have curbed him in response to the question so that you could have enough facts before you to make intelligent choices as to whether to keep him.

The fact remains, however, that the juror, in response to probing questions from the court, repeatedly asserted his ability to be impartial. We are satisfied that the trial court did not abuse its discretion in concluding that Siefring could be impartial.

■ Defendant also alleges that the *voir dire* of juror DiGiacomo was insufficient to reveal that juror's potential bias. Specifically, defendant claims that the trial court erroneously denied defense counsel's motion to dismiss this juror for cause when the juror indicated that he believed that evidence of a prior conviction suggested that a defendant was guilty of the present charge. The trial court, however, instructed the juror that his function is "to listen to evidence and then decide whether the defendant is guilty of the charge that he is presently before you on and not what he did [in the past]." In response, the juror stated that he would follow the instruction. Although the trial court denied defense counsel's motion to excuse the juror, it granted a similar motion by the State because of the juror's bias against the government. We find no merit in defendant's contention that the *voir dire* of this juror was inadequate and that the trial court wrongly refused to excuse the juror for cause for the reason asserted by defendant.

■ Finally, defendant challenges the *voir dire* of juror Brush as insufficient to assess her impartiality because she equivocated about the presumption of innocence. Following the court's questioning of this juror, Thompson's attorney urged the court to ask the juror if she believed that a defendant is more likely guilty because he or she is charged with murder in a capital-penalty case. The court refused because it believed that the question already had been answered in the negative.

When conducting a follow-up examination of the juror, however, the court closely questioned her regarding the presumption of innocence. Because the juror's responses indicated that she would not afford defendants the presumption of innocence, the court granted defense counsel's motion to excuse the juror for cause. The court's conduct lends no support to the proposition that the *voir dire* was inadequate.

In sum, we believe that the court's *voir dire* interrogation was sufficiently probing to expose potential bias of the jurors. Although the interrogation was less searching than that requested by counsel, we are satisfied that the *voir dire* was sufficiently thorough to assure the selection of an impartial jury. *Biegenwald II, supra,* 106 *N.J.* at 29.

### 3. *Death Qualification*

Defendant challenges the *voir dire* of certain jurors as inadequate to disclose "whether jurors would automatically vote for the death penalty [for all persons convicted of] murder." Again, we disagree.

█ In its initial instruction to the jurors, the court advised them that the defendants were entitled to the presumption of innocence, that the trial would be bifurcated, that the penalty phase would involve mitigating and aggravating factors, that the State's burden was to prove beyond a reasonable doubt the existence of an aggravating factor even before considering the appropriateness of the death penalty, and that the jury's responsibility was to weigh the aggravating factors against the mitigating factors. Defense counsel did not object to the trial court's description and does not point to any juror who was confused by these instructions. We find that the initial instructions were adequate.

In describing the death-qualification process, the trial court stated:

Like the general population in our county, the people, I'm sure on this panel, probably have widely differing opinions. Some of you may believe that a death

penalty should never be imposed no matter what crime a defendant committed. Others may believe that a death penalty could always be imposed if a defendant is found guilty of murder, no matter what the circumstances. Some of you may believe that the death penalty is proper in some cases but not others. Some of you may not have formed opinions on the subject. Having any of these views does not necessarily disqualify you from serving on this jury.

\* \* \* \* \* \* \* \*

In order to save time, you will shortly receive a preliminary questionnaire which you should fill out. You will be asked under oath whether the answers to these preliminary questions are true. I will then question you on matters relating to some of those answers, especially with respect to your views concerning the imposition of a death penalty and other matters that may be appropriate to your serving as a juror in this case.

These instructions told the jurors to expect questions regarding their views on the death penalty without telling them "what answers during the death qualification process lead to automatic excusal and what responses avoid excusal." *Williams II, supra,* 113 *N.J.* at 412. Pointing to the *voir dire* of two venirepersons, Barbara Swartz and Evelyn Ebling, defendant contends that the trial court's inquiry into the jurors' opinions about the death penalty was insufficient to identify jurors who were excludable for cause.

The *voir dire* of Swartz concerning her views on the death penalty consisted of the following:

THE COURT: Do you have any religious, conscientious or personal scruples or opinions in opposition to capital punishment which would render you unable to return a verdict carrying the death penalty?

MS. SWARTZ: No.

THE COURT: Do you have any religious, conscientious or personal scruples or opinions in favor of capital punishment which would cause you to automatically impose a death sentence if a defendant is found guilty?

MS. SWARTZ: No.

\* \* \* \* \* \* \* \*

THE COURT: Do you believe that every murder is committed in an outrageously or wantonly vile, horrible or inhumane manner?

MS. SWARTZ: No.

Following this questioning, neither defense counsel objected to Swartz for cause, and both told the court that they had no further questions.

With respect to juror Ebling, the court conducted the following inquiry into his views regarding the death penalty:

THE COURT: Do you have any fixed opinions concerning the crime of murder?

MR. EBLING: No.

THE COURT: Do you have any religious, conscientious or personal scruples or opinions in opposition to capital punishment which would render you unable to return a verdict carrying the death penalty?

MR. EBLING: No.

THE COURT: Do you have any religious, conscientious or personal scruples or opinions in favor of capital punishment which would cause you to automatically impose a death penalty?

MR. EBLING: No.

THE COURT: All right. Let me ask you this: Do you feel that if someone is convicted of a prior offense, he or she would more likely than not commit another offense?

MR. EBLING: No.

THE COURT: Do you believe that every murder is committed in an outrageously or wantonly vile, horrible or inhumane manner?

MR. EBLING: At times, I believe so.

THE COURT: Make sure you understand the question. There are a lot of murders. Do you have an opinion that all of those murders are committed in an outrageously or wantonly vile, horrible or inhumane manner?

MR. EBLING: No, I guess not.

THE COURT: I didn't hear you.

MR. EBLING: No.

THE COURT: Do you recognize that there may be murders of different severity?

MR. EBLING: Yes.

Although Thompson's attorney unsuccessfully requested further questioning, defendant's counsel stated that he had "no questions and no objections" regarding the juror's preliminary qualification.

In our recent decision in *Williams II*, we recognized that

[g]iven the important, delicate, and complex nature of the death qualification process, there can be no substitute for thorough and searching inquiry by the trial court into each individual's attitude concerning the death penalty. An important ingredient in this inquiry is the use of open-ended questions, which in our opinion are most likely to provide counsel and the court with insight into jurors' opinions and biases. [*Id.* at 413.]

We continue to believe that trial courts should not rely on leading questions, but should formulate questions that give potential jurors the opportunity to air their views on the death penalty. Here, however, defendant's counsel declined the opportunity to request further questioning and did not object to the jurors' qualifications. Furthermore, the relatively limited *voir dire* of jurors Swartz and Ebling does not indicate the tenor of the trial court's questioning of other jurors. Although the court often began the death-qualification inquiry by simply asking whether the juror would automatically vote for or against the death penalty if a defendant was convicted of murder, it generally pursued an affirmative response with more detailed questioning. Furthermore, in numerous instances, the court asked jurors more open questions, such as "what is your opinion, if you have one, concerning the death penalty," or "what is your viewpoint concerning the death penalty." Although the *voir dire* may not have been perfect in all respects, we are satisfied that it was sufficient to enable counsel and the court to evaluate the jurors' fitness to serve.

Defendant also asserts that the court was not sufficiently responsive to counsel's request for follow-up questions regarding death qualification. For example, the court asked Thomas Galante if he had an opinion concerning the death penalty. Galante responded, "I am for the death penalty to a different degree * * *. Different things constitute the death penalty to me." At the request of Thompson's counsel, the court continued the *voir dire* of Galante:

THE COURT: I have been informed that I may have cut you off when I asked you a question.

MR. GALANTE: I don't recall.

THE COURT: Me either. What is your opinion of the death penalty, if you have one?

MR. GALANTE: My opinion of it?

THE COURT: Your opinion.

MR. GALANTE: Fine. For a violent crime, it has to be very violent. My opinion is what I get from reading about how you handle your crime, such as a husband shooting a wife, you call it a crime of passion. Sometimes it doesn't

warrant the death penalty. At least society has said that. That's what I mean by my opinions are what society's opinions are.

THE COURT: You are part of society and you make up the opinions.

MR. GALANTE: Yes.

Thus, the additional question elicited information that enabled counsel and the court to evaluate intelligently Galante's fitness to serve on the jury. Defendant's counsel did not object to Galante or to the other jurors challenged on this appeal. We find no reversible error in the trial court's questioning regarding death qualification.

Defendant's next challenge to the *voir dire* is that the trial court failed to provide five jurors with an adequate explanation of aggravating factor c(4)(c). In those five instances, the trial court asked the jurors, "Do you believe that every murder is committed in an outrageously or wantonly vile, horrible or inhumane manner?" Apparently the purpose of the question was to ascertain whether a juror could distinguish the commission of a murder that satisfied c(4)(c), which would subject the defendant to the death penalty, from one that would not. As discussed *infra* 385 to 388, the court erroneously described the essence of aggravating factor c(4)c. We do not believe, however, that the trial court's misstatement of law in this respect could have led to the improper seating of jurors.

4. *Constitutionality of the Death–Qualification Process*

Defendant argues that the death-qualification process, which required potential jurors to express their ability to return a death sentence prior to the guilt phase, deprived him of the right to an impartial jury. Of the eighty-eight potential jurors who were not excused for other reasons unrelated to their views on death penalty, twenty-two, or 25%, were excused because of their opposition to the death penalty, while only six, or 6.8%, were excused because they would automatically impose the death penalty on all persons convicted of murder. Defendant argues that the process produced a conviction-prone jury in the guilt phase. His point is that jurors should be death

qualified only after a murder conviction and prior to the penalty phase. We previously rejected this contention in *Ramseur, supra,* 106 *N.J.* at 248–54, in which we explain that the Death Penalty Act presupposes that the same jury that hears the guilt phase will hear the penalty phase. Accordingly, "the State is entitled to insist on a properly conducted interrogation of jurors prior to the guilt phase of a capital trial to determine whether their views on capital punishment will substantially interfere with the performance of their duties as jurors [in the guilt or penalty phase]." *Id.* at 254; *accord State v. Bey (Bey II),* 112 *N.J.* 123, 150 (1988); *State v. Moore,* 113 *N.J.* 239, 272 (1988); *State v. Rose,* 112 *N.J.* 454, 476–77 (1988); *State v. Zola,* 112 *N.J.* 384, 397–99 (1988); *State v. Koedatich,* 112 *N.J.* 225, 296–97 (1988). Contrary to the dissent, we are unpersuaded that new evidence shows the death-qualification process is unconstitutional under the State Constitution. *Post* at 392–403. We do not say that death qualification of jurors is constitutionally compelled, only that it is constitutionally permissible.

Defendant also contends that the death-qualification process improperly leaves jurors with the impression that the defendant is guilty of murder and that the only real dispute is over the appropriate punishment. In *Williams II,* we rejected this claim, provided that the trial court ascertains that each juror will apply the law and that each juror understands both the presumption of innocence and the State's burden to prove the defendant guilty beyond a reasonable doubt. 113 *N.J.* at 414 n. 6. We explained, "[s]ince a properly instructed jury can understand that death qualification is based on a hypothetical finding of guilt, and nothing more, we believe that the risk of prejudice to the guilt-innocence phase is minimal." *Ibid.* As in *Williams,* we reject defendant's contention on this point.

### 5. *Witherspoon Excludables*

Defendant contends that the trial court erred in excluding three jurors for cause under the standard set forth in *Wither-*

*spoon v. Illinois*, 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776 (1968), as modified by *Adams v. Texas*, 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980), and *Wainwright v. Witt*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985). In *Ramseur*, we accepted the *Adams–Witt* modification of *Witherspoon* as the relevant standard for determining whether a juror's scruples concerning the death penalty prevents him or her from sitting in a capital case. 106 *N.J.* at 255–56. Under the *Adams–Witt* test, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams, supra*, 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 589. Prospective capital jurors need not aver that the gravity of the task will have no effect on their ability to perform their duties. *Ramseur, supra*, 106 *N.J.* at 256. Trial courts are granted "a sound measure of discretion" to determine whether a juror can discharge his or her duties or whether the juror's views on the death penalty would substantially impair his or her ability to perform those duties. *Ibid.* It is against these standards that we test the exclusion of the three jurors.

### a. *Juror Kanzler*

When Kanzler was questioned by the trial court about her views regarding the death penalty, the following exchange occurred:

THE COURT: I would like to ask the question concerning your viewpoint of the death penalty.

MS. KANZLER: Well—

THE COURT: What is your opinion of the death penalty?

MS. KANZLER: For many years I thought if someone else took another person's life they should receive the death penalty, but now I have changed my philosophy and I think everyone is entitled to his life unless God takes it. So I wouldn't think of the death penalty.

THE COURT: All right. Let me ask you this: If you were selected as a juror and there was a finding by that jury, and I'm not talking about death now, I'm talking about whether or not the defendants are innocent or guilty. If the jury concluded that they were guilty of murder and then the jury goes into the second phase of the case, as I explained before, that is, to determine whether or

not the defendant must be put to death, could you consider the imposition of the death penalty? We are not saying how you would decide, but would your mind be open enough to consider the death penalty and listen to the factors of the case?

As I told you before, in the penalty phase of the case, there must be aggravating factors in order for there to be a death penalty. And the jury may take into account, if presented, mitigating factors. And after they receive both of those, if they are in existence, then and only then can they determine whether to impose the death penalty.

Would you be able to participate in such a jury and consider whether to impose the death penalty, or would you be automatically opposed to the death penalty? Do you understand the question?

MS. KANZLER: Yes, I do, but I think I wouldn't think of the death penalty. I would rather him go serve a sentence in prison.

THE COURT: So it's your opinion that your opinion is firm, if I understand you correctly, that regardless of the manner in which the homicide was committed, you would not vote for the death penalty. Is that your opinion?

MS. KANZLER: I don't think I could, really.

THE COURT: Do you feel that there is a set of circumstances that would cause you to vote for the death penalty, or are you saying that no matter what type of case it is, no matter how the homicide is committed, under no circumstances would you vote for death?

MS. KANZLER. I really wouldn't want to, no.

THE COURT: I don't think any jurors want to in that sense, but do you think you would be able to even consider the question, or is your mind completely closed against the death penalty? Do you understand what I am trying to ask?

MS. KANZLER: Yes, I know what you are trying to ask me, but I don't know. I wouldn't think that I could, truthfully.

Defendant contends that because Kanzler did not state "unequivocally" that she would never consider the death penalty, and did not indicate that she would "automatically" vote against the death penalty, her exclusion for cause was improper. Applying the *Adams–Witt* test, we are satisfied that the trial court did not abuse its discretion in concluding that this juror's scruples "substantially impaired" her ability to follow the law.

### b. *Juror Kozlowski*

Defendant contends that Kozlowski, who opposed the death penalty on religious grounds, was erroneously excluded because he indicated that despite his view, he understood the societal concerns were served by the death penalty. After the

juror stated his opposition to the death penalty for religious reasons, the following exchange occurred:

THE COURT: That opinion that you have right now, as you have expressed it, is that opinion so firm that you are stating to the Court that under no circumstances would you vote for the death penalty, assuming the proofs are there, because of your religious belief?

MR. KOZLOWSKI: I really can't answer that question. But in my own conscience, I don't know. This is the first time it was put to me in my life. I don't know really what to say.

THE COURT: How firm is your religious belief that you should not take a life? In other words, in this instance, vote for the taking of a life? How firm is your religious conviction on that point?

MR. KOZLOWSKI: I always believe that a man deserves a second chance in life. He only has one life, and I can't really condemn a man to life myself. If I had anything to do with it, really, a man could be put away or something, but I can't say that, you know, because he maybe committed a terrible crime and then I would like to condemn him to death.

I would be like judge, God and jury altogether. I couldn't do that. I don't know what to answer to that, honestly.

THE COURT: All right.

MR. KOZLOWSKI: I would be afraid.

THE COURT: All right.

MR. KOZLOWSKI: When the day comes that I will be judged, I will be afraid.

THE COURT: Are you stating to the Court that if you were to be selected in this case, that regardless of the evidence or regardless of the manner in which this alleged crime of a homicide was committed, you would not be able to consider the imposition of the death penalty?

MR. KOZLOWSKI: As far as my conscience is concerned, I don't think I would be able to, no.

The prosecutor moved to excuse Kozlowski because the juror had expressed firm opposition to the death penalty. Thompson's counsel, however, urged the court to ask whether the juror would be able to put aside his religious convictions. The trial court agreed, and elicited the following response from Kozlowski:

Well, I am not a highly religious man, Your Honor, but it's a thing that's born into you. You see, thou shalt not kill and things like that are born into you. Even if a man is a criminal, he is supposed to be forgiven or you put the man in a place where he will do no harm to anyone or something like that, you know? But taking a life, I mean, I don't know.

In response to a further question whether Kozlowski was saying that he could not even consider the death penalty, the juror responded:

I don't know what to say to you. To harm someone, even though he is a criminal or whatever, if he is proven guilty like you said beyond a shadow of a doubt like earlier, I don't know what to say, really. It's something inside of you that you feel that it's not right. You may be doing right for society but you are not doing right for yourself.

The court excused the juror. Jurors cannot be expected to state "unambiguously" or "with unmistakable clarity" that they would never impose the death penalty. *Ramseur, supra,* 106 *N.J.* at 257. Here, the trial court was obliged to determine from the juror's responses whether his scruples against the death penalty would prevent or substantially impair his ability to perform his duties as a juror in a capital case. We find that the trial court's questioning manifested a sufficiently sensitive appraisal of the juror's capabilities, and that the court did not abuse its discretion in excusing this juror for cause.

### c. *Juror Marino*

██ When Marino initially expressed religious opposition to the death penalty, the trial court inquired into the firmness of the juror's religious convictions:

THE COURT: Do you feel that your religious conviction is so strong that you would not even consider the death penalty, if you were a juror?

THE JUROR: It would bother me.

THE COURT: All right. And recognizing—

THE JUROR: I don't say they shouldn't get the death penalty but this is my feelings.

THE COURT: That's what we are talking about. If you were a juror and that jury concluded that a Defendant was guilty of murder by his own conduct, are you stating to the Court that when that jury went into the penalty phase of a case, that your religious convictions are such, your personal religious convictions are such that you could not vote or you could not even consider the death penalty?

THE JUROR: Well, it's pretty much so, yes, I would say so.

THE COURT: In other words, regardless of the nature of the manner in which the murder was committed, are you stating that your religious convictions are so firm that you would not be able to consider the death penalty?

THE JUROR: To be perfectly truthful, it would bother me.

THE COURT: All right. How much would it bother you.

THE JUROR: Well, it would bother me. I wouldn't want to be involved in giving the death sentence to anybody.

After this questioning, the prosecutor moved to exclude the juror, and neither defense counsel argued that the juror's responses revealed an open mind toward the death penalty. Thompson's counsel stated that he had no objection, and Hunt's counsel indicated that his only objection was the exclusion of a juror from the guilt phase because he or she would be unable to consider the death penalty in the penalty phase. The trial court excused the juror.

Defendant now argues that although the juror's responses indicated nervousness and unease about imposing the death penalty (*e.g.,* "it would bother me"), those responses do not establish that the juror would be unable to perform his duties in accordance with the law (*e.g.,* "I don't say they shouldn't get the death penalty but this is my feelings"). In so arguing, defendant draws on the explanation in *Adams:*

[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. [448 *U.S.* at 50, 100 *S.Ct.* at 2529, 65 *L.Ed.*2d at 593.]

Many of Marino's responses, which are couched in terms of "feelings," could be construed as mere expressions of nervousness. Other statements, such as "I wouldn't want to be involved in giving the death sentence to anybody," suggest a firm opposition to the death penalty. Given the probing question of the trial court and the failure of defense counsel to object to the excuse of the juror, we are satisfied that the court did not abuse its discretion in excluding this juror for cause.

6. *Voir Dire Regarding Prior Convictions*

Approximately two months before the murder, in October 1982, Hunt stabbed Lawson in the arm, apparently in response to Lawson's physical abuse of Charlotte. Defendant was arrested, and at Lawson's request, the charges were dropped.

In response to defendant's pretrial motion, the trial court ruled that evidence of the prior stabbing incident would be admissible to prove motive and intent, *Evid.R.* 55, and that an appropriate limiting instruction would be given, *Evid.R.* 6. Defendant challenges both the *voir dire* of jurors about their feelings concerning a previously-convicted defendant and the failure of the court to instruct the jury that the prior stabbing could not be used to show defendant's propensity to commit assault. We first consider defendant's contention that the trial court exceeded the proper scope of *voir dire* in questioning potential jurors about the effect on them of evidence of a defendant's prior conviction.

Although defendant had not previously been convicted of a prior offense, Thompson had been convicted in 1980 of assault. In response to a request by Thompson's counsel, the court asked potential jurors, "Do you feel that if someone is convicted of a prior offense, that person would be more likely to commit another offense or the offense for which he was charged?" If a juror was uncertain, the court asked follow-up questions to assure that the juror understood that a prior conviction was relevant for the limited purpose of impeaching the credibility of a witness. Defendant contends that the *voir dire* about prior convictions led those who eventually served as jurors to assume incorrectly that he had been convicted of the prior stabbing of Lawson.

■ Under *Rule* 1:8-3, the scope of *voir dire* "rests in the discretion of the trial court limited only by the demands of fairness and justice." *State v. Sullivan,* 43 *N.J.* 209, 239 (1964), *cert. denied,* 382 *U.S.* 990, 86 *S.Ct.* 564, 15 *L.Ed.*2d 477 (1966); *accord Biegenwald II, supra,* 106 *N.J.* at 27–30. Absent a showing of abuse, the trial court's exercise of discretion will not be disturbed on appeal. *Biegenwald, supra,* 106 *N.J.* at 29. Under the circumstances, which include the fact that Thompson's conviction for assault and his indication that he would testify at trial, we find that the trial court was well

within its discretion in inquiring whether potential jurors would be biased by the knowledge of Thompson's prior conviction.

Defendant argues that the trial court committed reversible error in failing to instruct venirepersons during the first three days of *voir dire* that a conviction was admissible for the limited purpose of impeaching a defendant's credibility. Defendant links this point to the further argument that the trial court committed reversible error in failing to provide a limiting instruction following admission of the evidence of the October 1982 stabbing of Lawson. We treat the arguments separately. In light of Thompson's prior conviction for assault, the trial court did not abuse its discretion in reminding the venirepersons about the limited use of a prior conviction. That Thompson, who had been convicted of assault, subsequently entered a plea agreement with the State, does not detract from the correctness of the trial court's procedure. In response to defendant's pretrial motion to bar reference to his prior stabbing of Lawson, the trial court ruled that evidence of the stabbing was admissible to establish motive, but that it would give a limiting instruction at trial. When evidence of the stabbing was elicited by the State on its direct examination of Fennell, however, the trial court failed to provide a limiting instruction, and the defendant did not object. Hence, we treat the matter as plain error. The question is whether the failure to provide the instructions is "clearly capable of producing an unjust result." *R.* 1:7-2 and *R.* 2:10-2; *State v. Macon*, 57 *N.J.* 325 (1971). Our review of the record satisfies us that the court's failure to provide the limiting instruction did not have that capability.

The charge never mentioned the testimony about the October 1982 incident, and focused the jury's attention on the December 2, 1982, homicide. Furthermore, the evidence that defendant stabbed Lawson was overwhelming. Several witnesses established that on the day of the murder, after uttering threats about Lawson, defendant entered the victim's apartment hold-

ing a knife. Defendant's apparent purpose was to avenge his sister's abuse at Lawson's hands. Defendant admitted that he went to Lawson's apartment with a knife, but added that he was dissuaded from attacking him. Thompson contradicted defendant's testimony by stating that after he and defendant entered Lawson's apartment, defendant stabbed the victim repeatedly. That testimony was confirmed by Taylor, who testified that immediately after the murder, defendant admitted he had killed Lawson. Defendant's clothes, stained with the victim's blood, provided further corroboration. Based on the "overwhelming nature of the testimony pointing to defendant's guilt," *State v. Lair*, 62 *N.J.* 388, 392 (1973), and the relative insignificance of the testimony about the prior stabbing incident, we find the error was harmless. *Id.; see also Rose*, supra, 112 *N.J.* at 490 ("[i]n view of the substantial evidence of defendant's guilt, we do not find that the court's failure to give this limiting instruction constituted reversible error in the guilt phase of the trial"); *State v. Stefanelli*, 78 *N.J.* 418, 436–37 (1979) (trial court's failure to instruct the jury that a co-defendant's guilty plea could not be used to show that the defendant was guilty ruled harmless error because evidence and testimony independently established defendant's guilt).

–III–

## TRIAL ISSUES

### A. Guilt–Phase Challenges

#### 1. *Exclusion of Brown's Testimony*

Defendant contends that the trial court committed reversible error in excluding an out-of-court statement made by his sister, Charlotte, to Aretha Brown, the victim's sister. The statement described beatings inflicted by the victim on Charlotte. When cross-examining Brown, defense counsel tried to elicit that Lawson had beaten her and that Charlotte had complained to defendant so he would "rough up" Lawson. The apparent

purpose of the cross-examination was to establish a basis for a manslaughter charge on the theory that if defendant killed Lawson, he did so in a state of rage engendered by Lawson's treatment of Charlotte.

At trial, defense counsel stated he was being "creative" in eliciting the statement, but he now relies on *Evidence Rule* 63(10) pertaining to declarations against interest.[1] The factual premise is that Charlotte would not have made the statement to Brown unless true because it held Charlotte up as "an object of hatred, ridicule or social disapproval." *Evid.R.* 63(10). Defendant submits that battered women often remain silent because of shame, and, therefore, that any admission by a battered woman to stay with an abusive male is sufficiently reliable to warrant its admission. Defendant points to our decision in *State v. Kelly*, 97 *N.J.* 178, 195 (1984), in which we credited expert testimony that "battered women, when they want to leave the relationship, are typically unwilling to reach out and confide in their friends, family, or the police, either out of shame and humiliation, fear of reprisal by their husband, or the feeling they will not be believed." *Cf. Muller v. Wisconsin*, 94 *Wis.*2d 450, 461–62, 289 *N.W.*2d 570, 576–77 (1980) (declarant's statement admitting in a custody hearing to having sex with the man that her estranged husband killed was so contrary to declarant's interests that it would make her an "object of hatred, ridicule, or disgrace").

Here, however, we need not decide whether the hearsay testimony should have been admitted. Even if the trial court

---

[1] *Evidence Rule* 63(10) provides:

A statement is admissible if at the time it was made it was so far contrary to the declarant's pecuniary or proprietary interest or so far subjected him to civil or criminal liability or so far rendered invalid a claim by him against another or created such a risk of making him an object of hatred, ridicule or social disapproval in the community that a reasonable man in his position would not have made the statement unless he believed it to be true, except that such a statement is not admissible against a defendant other than the declarant in a criminal prosecution.

erred, the error was harmless. The jury was fully apprised of the victim's alleged beatings of Charlotte through the testimony of other witnesses. Although Charlotte denied that Lawson beat her, except on one occasion when she struck him first, Fennell, Thompson, and defendant all testified that Lawson frequently beat Charlotte and that she informed defendant about these beatings. Brown's testimony would have been merely cumulative.

## 2. Co–Defendant's Statement Implicating Defendant

Defendant contends that the trial court committed reversible error in admitting under the co-conspirator exception to the hearsay rule, *Evid.R.* 63(9)(b), a statement made by Thompson outside of defendant's presence, that "this nigger [referring to Hunt] just killed a nigger on the sixth floor." Taylor's trial testimony conflicted with her own sworn statement to the police, in which she stated:

It was around 2:30 when Kenneth Thompson came in and around. They had blood all over them. I asked them what happened. He [referring to Thompson] said he just killed a nigger.

Following a *Evidence Rule* 8 hearing, which was conducted immediately before Taylor's testimony, the trial court ruled that the version of Thompson's statement that implicated defendant could be admitted through Taylor under *Evidence Rule* 63(9)(b) as a statement made by a co-conspirator during the course of a conspiracy, the scheme to dispose of evidence to hinder apprehension or prosecution.

Defendant first argues that no conspiracy existed at the time the challenged statement was made, and that even if the statement was made in the course of, it was not in furtherance of the conspiracy. The State responds that the conspiracy between Thompson and defendant to murder Lawson included a plan to conceal their criminal conduct, and that Thompson made the statement to solicit Taylor's help. According to the State, the statement was made both in the course of and in furtherance of a conspiracy to murder. Alternatively, the State con-

tends that the statement was made in the course of and in furtherance of a conspiracy to hinder apprehension or prosecution.

■ The co-conspirator's exception to the hearsay rule, *Evidence Rule* 63(9)(b), provides in relevant part:

A statement which would be admissible if made by the declarant at the hearing is admissible against a party if * * * at the time the statement was made the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan.

To gain admission under *Evidence Rule* 63(9)(b), a statement must satisfy three conditions: (1) the statement must be made in furtherance of the conspiracy; (2) the statement must be made during the course of the conspiracy; and (3) the prosecution must demonstrate by "a fair preponderance of evidence," independent of the hearsay, that the conspiracy existed and that the defendant participated in it. *State v. Phelps*, 96 *N.J.* 500, 509–10, 518 (1984). The third condition was designed to reduce "the fear that a defendant might be convicted or held liable in damages solely on the basis of evidence that he has had no opportunity to impeach or refute." *Id.* at 510–11.

■ We first consider whether the record supports the proposition that the statement was made in furtherance of and during the course of the conspiracy. According to Taylor's statement to the police, Thompson asked her to get the garbage bags in which defendants disposed of their blood-stained clothes and knives. At trial, Taylor stated that she then tossed one of the garbage bags into a dumpster and another onto the roof of a nearby building. Thus, evidence supports the proposition that the challenged statement was made by Thompson to Taylor to obtain her help in disposing of the evidence of the murder. Arguably, however, Thompson's statement was made not in furtherance of a conspiracy, but merely in response to Taylor's inquiry about defendant's identity and the reason he was in Thompson's apartment. Nonetheless, we find that the trial court acted within its discretion in concluding that the

statement was committed during the course of and in further-ance of a conspiracy to hinder apprehension or prosecution.

■ With respect to the third element of the *Phelps* test, there was overwhelming evidence, independent of the hearsay argument, linking defendant either to a conspiracy to murder or to a conspiracy to hinder apprehension. Fennell, Charlotte Hunt, Taylor, and Thompson all suggested that Thompson and defendant conspired to murder Lawson. Furthermore, Taylor described how defendant and Thompson assisted each other in cleaning up and in disposing of their blood-stained clothes and knives. All this suggests that the defendants conspired to hinder their apprehension or prosecution.

■ Finally, our review of the record leads us to conclude that even if the challenged testimony was erroneously admit-ted, the error was harmless beyond a reasonable doubt. *State v. Macon,* 57 *N.J.* 325 (1971); *R.* 2:10-2. At trial, testimony was elicited on the State's direct examination of Taylor:

Q. When the two of them came in with blood, did you ask anybody what happened?

A. Two of them didn't come in.

Q. When they came.

A. When James?

Q. When they came in, one behind another.

A. When James Hunt came in, I asked him who is—I said, Who are you, what you doing in here and he was just looking, you know.

Q. Did you ask Raheem [Thompson] anything?

A. Yeah, I was asking him, he just was saying, he just killed somebody on the sixth floor, he just killed a man on the sixth floor.

Q. I'm sorry. You were asking who?

A. He was telling me that.

THE COURT: Just read back the answer, the question and answer.

(At this time the court reporter read back the last question and answer.)

BY MR. GOLDEN:

Q. I'm sorry, I'd like you to repeat that again what exactly did Raheem say to you?

A. He said, this nigger just killed a nigger on the sixth floor, that's what he said to me.

Q. That's exactly what he said?

A. Yes, he did.

Q. Referring to who?

A. To James Hunt, he didn't know his name, he said, this nigger just killed the nigger on the sixth floor, stay in there and just calm down because I was crying and, you know, upset.

That testimony by Taylor conflicted with her statement to the police on December 3, 1982, in which she suggested that Thompson had implicated himself, not defendant. When confronted with her prior inconsistent statement, Taylor claimed that she meant to say in the statement that Thompson had implicated defendant, not himself. On the identity of Lawson's killer, Taylor's sworn statement to the police and her trial testimony were in apparent conflict. For this and other reasons, the prosecutor acknowledged on summation that Taylor "was a liar."

Given the overwhelming proof that defendant killed Lawson and Taylor's questionable credibility, we conclude that any error in admitting her testimony was harmless. *See State v. D'Arco*, 153 *N.J.Super.* 258, 266 (App.Div.1977) (court did not consider whether hearsay statements were properly admitted under *Evidence Rule* 63(9)(b) because the independent proof of the substantive crimes showed that admission could not be harmful error).

### 3. *Testimony Regarding Defendant's Character*

Defendant claims that in his re-direct examination of Patricia Fennell and again in his summation, the prosecutor improperly placed in issue defendant's character. The general rule is that the prosecutor may not offer evidence of the defendant's character to support an inference about the defendant's conduct on a specific occasion unless the defendant has first produced evidence of good character. *State v. Welsch*, 29 *N.J.* 152 (1959); *Evid.R.* 47. Here, however, the State adduced evidence about defendant's bad character, even though defendant had not offered evidence of his good character.

Specifically, defendant points to the prosecutor's questioning of Fennell on re-direct examination concerning defendant's

"bad temper" and to the prosecutor's suggestion during summation that defendant is "a hothead * * * who loses his temper more quickly than the average person." Defendant's point is that the prosecutor impermissibly placed defendant's character in issue to discourage the jury from convicting defendant of the lesser-included offense of passion/provocation manslaughter. Defendant contends that these errors were harmful because they "created a reasonable possibility that the jurors found Mr. Hunt guilty of murder when they might otherwise have found him guilty of manslaughter." The State argues that its questioning regarding defendant's temper merely explained the testimony elicited by defendant's counsel during cross-examination of Fennell, in which Fennell referred to defendant's mood prior to killing Lawson. Similarly, the State contends that the challenged remarks in the prosecutor's summation were a fair response to arguments made in the defendant's summation that defendant's anger was sufficient to justify reducing murder to manslaughter.

On cross-examination, Fennell described defendant's appearance when she saw him on the stairwell with Thompson. She testified that defendant "[h]ad a kind of look that he was mad," and that she had tried to dissuade defendant from hurting Lawson by telling him "it didn't make no sense because Charlotte is going to be right back with him again."

Over a defense objection, the prosecutor asked the following questions of Fennell on re-direct examination:

Q. Ms. Fennell, when you were talking about James Hunt yesterday you said something about not being able to talk to him when he was like that. What did you mean by that?

A. Well, when Man [Hunt] is mad, you can't tell him nothing. I mean, when he get real mad, it's best for him to, you know, cool off by hisself [sic] because nobody can tell him nothing.

Q. Have you seen him mad on many occasions, many times? Have you seem him mad?

A. I seen him so mad he could tear up a whole house.

Q. All right. Does he have a bad temper?

A. I wouldn't really say a bad temper, just when somebody really get on his last nerves.

 The trial court permitted the State to question Fennell about defendant's temperament because it anticipated that the defense was likely to seek an instruction on manslaughter. Thus, the trial court reasoned, defendant's temperament was at issue and the interrogation was relevant to determining whether defendant was reasonably provoked. We question that reasoning. The test for determining whether a homicide occurred "in the heat of passion resulting from a reasonable provocation," *N.J.S.A.* 2C:11–4b(2), is objective. Conceivably, testimony about defendant's bad temper could shed light on the credibility of the contention that his conduct was objectively reasonable. To the extent the State established that defendant reacted because he is a "hothead," it diminished his contention that his conduct was objectively reasonable. The relevant inquiry, however, is not whether the defendant was more susceptible than another to provocation, but whether a reasonable person would have been provoked under the circumstances. *State v. Grunow,* 102 *N.J.* 133, 141 (1986); *State v. Pratt,* 226 *N.J.Super.* 307, 314–21 (App.Div.1988). We are concerned that the introduction of testimony about defendant's subjective disposition could deflect the jury's attention from determining whether his conduct was objectively reasonable. In reaching that conclusion, we recognize that a trial, particularly a capital case, is not a minuet. On the record before us, defense counsel, if he did not invite the prosecutor's re-direct examination, at least stimulated the response.

 A similar pattern emerged on summation. Defense counsel first referred to Fennell's testimony that defendant looked angry after learning that Lawson had beaten Charlotte, and that defendant's anger intensified when he saw that Charlotte's lip had been "busted." Based on this evidence, the defense counsel argued that defendant had acted in the heat of passion and that, at worst, he was guilty of manslaughter. In reply, the prosecutor stated in his summation:

Now, I agree here that a man was slaughtered. But that doesn't necessarily make it legally manslaughter. You have to appreciate we can't all go around

killing our brothers-in-law because we don't like the way they're treating our sisters and say I was mad so it was manslaughter not murder. To have manslaughter you need two other elements. You need legal provocation, not just provocation but legal provocation. And that's something that would make an ordinary average reasonable person lose control of themselves. Not a hothead, not a guy who's got a vendetta, not a guy who loses his temper more quickly than the average person, but it has to be something that would make the average ordinary person lose control of himself.

\* \* \* \* \* \* \* \*

I submit to you that what we have here is in fact a vendetta. Is in fact a person with a bad temper and is not manslaughter but a preplanned vendetta carried out on December 2nd of 1982.

Defense counsel did not object to this or any other part of the prosecutor's summation. Nonetheless, we find that the prosecutor's comments suggesting that the defendant was "a hothead" and "a guy who loses his temper more quickly than the average person" were ill-advised. The question remains whether they constitute reversible error.

Notwithstanding its misperception of the relevance of defendant's bad temper, the trial court accurately instructed the jury to apply an objectively reasonable test in determining whether the defendant was legally provoked. Nothing in the trial court's charge suggested that defendant's character was relevant to the manslaughter defense. We conclude that the trial court's extensive and accurate charge on passion/provocation manslaughter sufficiently focused the jury's attention on the objective reasonableness of defendant's conduct to cure any prejudice caused by the prosecutor's re-direct examination and summation.

### 4. Dilution of State's Burden of Proof

■ Defendant contends that the prosecutor improperly diluted the State's burden of proof by telling the jury "you can figure out what happened and you will have to figure out what happened," and that the trial court further diluted that burden by advising the jury that it had a duty to determine "where the truth rests." We find these contentions to be without merit. The prosecutor's comment occurred at the close of a lengthy

summary of the evidence in a case in which the defendant asserted variously that he had not killed the victim and, if he had, he did so in the heat of passion. Moreover, defense counsel did not object to the challenged part of the summation. *See State v. Wilbely,* 63 *N.J.* 420, 422 (1973). For its part, the trial court provided detailed instructions to the jury on the State's burden to prove defendant's guilt beyond a reasonable doubt. Looking at the charge in its entirety, there was no error. *United States v. Gibson,* 726 *F.*2d 869, 874 (1st Cir. 1984); *United States v. Lemire,* 720 *F.*2d 1327, 1339–43 (D.C. Cir.1983); *United States v. Pine,* 609 *F.*2d 106, 107–08 (3rd Cir.1979); *see State v. Ravenell,* 43 *N.J.* 171, 186–87 (1964), *cert. denied,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965); *State v. Hipplewith,* 33 *N.J.* 300, 317 (1960).

5. *Constitutionality of New Jersey's Capital Murder Scheme*

 Defendant argues that the Death Penalty Act subjects him to cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States Constitution and article I, paragraph 1 of the New Jersey Constitution because the Act fails to provide for a manslaughter defense based on "extreme emotional disturbance." We disagree. Although the drafters of the Model Penal Code recommended the inclusion of such an offense, which would be an intermediate crime between the second-degree offense of passion/provocation manslaughter and capital murder, the New Jersey Legislature rejected the recommendation. *See State v. Grunow,* 102 *N.J.* 133, 140 (1986). In reaching that decision, the Legislature was acting within its constitutional powers. *See Ramseur, supra,* 106 *N.J.* at 267–70. Evidence of extreme emotional disturbance, however, may be relevant to disproving that a homicide was knowing or purposeful and, on the penalty phase, to establishing a mitigating factor. *N.J.S.A.* 2C:11–3c(5)(a).

6. *Sufficiency of the Evidence to Support Defendant's Conviction for Hindering Apprehension of Co–Defendant Thompson*

██ Count seven of the indictment charged defendant with hindering the apprehension or prosecution of another, namely, Thompson, in violation of *N.J.S.A.* 2C:29–3a. At the close of the State's case, defendant moved for a directed verdict of acquittal on this count. The motion was denied, and defendant was subsequently convicted. The only evidence providing the basis for this charge came from Taylor, who described how defendant and Thompson returned to Thompson's apartment, removed their blood-stained clothes, and changed into Thompson's clothes, and together put their clothes and knives in trash bags. Taylor told the police that Thompson and defendant then disposed of the bags, but at trial she said it was she who had disposed of the bags. Defendant argues that Taylor's testimony establishes only that defendant acted to hinder his own apprehension and that it did not provide a sufficient basis for his conviction for hindering the apprehension or prosecution of Thompson.

In assessing the sufficiency of the evidence, the relevant inquiry is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Brown,* 80 *N.J.* 587, 591–92 (1979) (quoting *Jackson v. Virginia,* 443 *U.S.* 307, 319, 99 *S.Ct.* 2781, 2789, 61 *L.Ed.*2d 560, 573 (1979)). So constrained, we find that there was sufficient evidence for a rational jury to find beyond a reasonable doubt that defendant hindered the apprehension of Thompson.

7. *Failure of court to instruct the jury that to find defendant guilty of capital murder it must find that he intended to cause death and not just serious bodily injury resulting in death*

In his dissent, Justice Handler writes that he would "reverse the defendant's conviction for capital murder and remand for a

re-trial on the charge of murder, including both accomplice murder, which was charged below, and serious-bodily-injury murder. In addition, defendant should be given the full opportunity on remand to assert that the evidence presented would support only a form of manslaughter." *Post* at 408–412. We disagree.

Defendant tried the case on the alternative theories that he did not commit the homicide or that if he did, he did so in the heat of passion. Thus, his trial strategy was predicated on the inconsistent propositions that he was either innocent of all charges or guilty of "passion/provocation manslaughter." *N.J. S.A.* 2C:11–4b(2). During the charge conference, defense counsel requested "a charge to read as the model charge 2.232 in its entirety including both the reference to reckless [sic] and reckless manslaughter and general manslaughter being a passion situation." Defense counsel explained, "I think I have the right to argue alternative theories to the jury even though my client has not adopted any of those theories." Consistent with defendant's trial strategy, however, the trial court charged only on passion/provocation manslaughter. The court did not deliver a charge on either aggravated manslaughter, *N.J.S.A.* 2C:11–4(a), or reckless manslaughter, *N.J.S.A.* 2C:11–4b(1). Defendant did not object to that portion of the charge. On appeal, defendant originally did not urge that the trial court's omission was error. The thrust of defendant's argument was that the homicide statute was constitutionally defective because it did not provide for "extreme emotional disturbance" manslaughter. As previously stated, *supra* at 372–374, we reject that argument. We refer to defendant's posture at trial and on appeal not because we are "overly-concerned" with defense counsel's "procedural errors," as the dissent asserts, *post* at 407 n. 5, but because the reference demonstrates counsel's lack of commitment to a charge of aggravated manslaughter.

After the oral argument, we held that a defendant convicted of knowingly or purposely causing serious bodily

injury resulting in death is not subject to the death penalty. *Gerald, supra,* 113 *N.J.* at 69. We ruled that a defendant charged with knowing or purposeful homicide, *N.J.S.A.* 2C:11–3a(1) and (2), could not be subject to the death penalty unless the jury found that the State had proved beyond a reasonable doubt that the defendant intended to kill the victim and not merely to cause serious bodily injury. Here, however, the charge instructed the jury that the defendant would be guilty of capital murder if he contemplated causing only serious bodily injury. Furthermore, the verdict sheet did not require that to find defendant guilty of capital murder, the jury must find that defendant contemplated causing death, not just serious bodily injury that resulted in death. As is explained more fully below, because of errors in the penalty phase, defendant is not subject to the imposition of the death penalty. The net result is that defendant stands convicted of murder, not capital murder. Consequently, it was harmless error for the trial court to fail to charge the jury that defendant would be guilty of only non-capital murder if it found that he intended to cause serious bodily injury resulting in death.

Although not essential to our disposition, we note that the evidence is overwhelming that defendant knowingly killed the victim. Defendant understandably predicated his defense on the hope that the jury would find that his "homicide which would otherwise be murder * * * [was] committed in the heat of passion resulting from a reasonable provocation." *N.J.S.A.* 2C:11–4b(2). When defendant learned that Lawson had abused defendant's sister, he grabbed a knife, saying as he headed toward Lawson's apartment "I told this motherfucker about fucking with my sister" and "I know what I got to do." The victim was stabbed twenty-four times. Nine of the wounds were penetrating, and some of them penetrated the victim's body for several inches. Following the murder, defendant fled to Taylor's apartment where he said, "I killed him. I broke the knife in him." Only in the most tenuous sense would the evidence have supported a charge of aggravated or reckless

manslaughter or of intending to inflict serious bodily injury, but not death, on another. We need not base our decision, however, on the insufficiency of the evidence to support those charges. We are satisfied that even if the evidence were sufficient, defendant was not prejudiced by the absence of the charges.

 In reaching the opposite conclusion, the dissent relies on *State v. Christener*, 71 *N.J.* 55, 69–74 (1976), in which the trial court instructed the jury on the former offense of first-degree murder, a charge for which there was an insufficient evidentiary basis. By providing the jury with the alternative of finding the defendant guilty of an unsupported first-degree murder charge, the trial court could have led the jury to compromise on the crime for which the defendant was convicted, manslaughter. Here, however, the more serious charge was amply supported by evidence. Indeed, it is difficult to imagine how the jury, having rejected the alternative of passion/provocation manslaughter, could have reached any other result. In effect, this case is the converse of *Christener*, in which there was a distinct possibility that the jury might not have found the defendant guilty if he had not been charged with first-degree murder. The jury rejected the charge of first-degree murder, but the charging of that offense may have induced the jury to compromise on a lesser charge. By contrast, the jury in the present case found the more serious charge substantiated. We do not believe that the failure to charge the lesser offenses increased the likelihood that the jury would find the defendant guilty of knowing murder. The jury had the opportunity to find the defendant guilty of the lesser offense that he espoused at trial, passion/provocation manslaughter, and rejected it. Furthermore, lowering the serious bodily-injury charge from capital to non-capital murder would not have made the passion/provocation manslaughter alternative more attractive to the jury.

## B. Death Penalty Challenges

 The State concedes that the penalty-phase charge was constitutionally defective because it did not state that to impose the death penalty, the jury must be convinced beyond a reasonable doubt that aggravating factors outweigh mitigating factors. *Biegenwald II, supra*, 106 *N.J.* at 63–67. That error alone would compel a new penalty-phase hearing and render moot most of defendant's penalty-phase objections. For reasons set forth below, however, we find that other penalty-phase errors preclude the possibility that defendant may be subject to the death penalty on remand.

### 1. *Instructions Concerning Jury Deliberations*

Under the Death Penalty Act, *N.J.S.A.* 2C:11–3c(3)(c), a decision by a penalty-phase jury that it cannot reach unanimity is itself a final verdict and must be entered by the trial court. Defendant asserts that such a non-unanimous verdict was reached by the jury and should have been accepted by the court. In addition, defendant argues that even if it was permissible for the trial court to require the jury to deliberate further, the court's supplemental charge, when added to the addendum to its main charge, was coercive. Because of these errors, defendant submits that he is entitled to be sentenced not to death but to a maximum term of life with thirty years of parole ineligibility. *N.J.S.A.* 2C:11–3c(3)(b).

We agree that the jury may have reached a non-unanimous verdict when it sent a note to the court stating, "[w]e cannot find a unanimous decision on the mitigating factor [sic] outweighing the aggravating factor." Consequently, we conclude that the court should have asked the jury whether the note stated its verdict or whether the jury wanted more time to deliberate. We also agree with defendant on the inadequacy of the trial court's instructions in response to the jury's note. The instructions did not remind the jury that a non-unanimous verdict was an acceptable outcome of its deliberations. Both of

these errors may have affected the outcome of the case. We are left with lingering doubts "that but for these errors, there is a realistic possibility that the death sentence would not have been imposed." *Ramseur, supra,* 106 *N.J.* at 300. We are convinced that the errors were so prejudicial that the only adequate remedy is to bar the imposition of the death penalty on remand. *Ibid.*

### a. *Jury Deadlock*

We turn first to the trial court's failure to determine whether the jury had reached a non-unanimous verdict. The jury retired to deliberate at 10:51 a.m., and at 12:30 p.m. it asked the court for a dictionary and the legal definition of "mitigate." The court advised the jury that the dictionary and the legal definition of "mitigate" are the same: "[t]o mitigate means basically 'to cause to become less harsh or to make less severe.' In other words, [mitigating factors] would cause you to lean toward the less severe penalty as opposed to a death penalty." Following that instruction, the jury resumed deliberations. The record does not indicate how long, if at all, the jury suspended its deliberations for lunch. At 2:45 p.m., the jury sent its note that it could not reach a unanimous decision on the balance of aggravating and mitigating factors. On receipt of this note, the trial court conferred with counsel for approximately twenty minutes, and then sent a note to the jury stating, "I've received your question. Please continue with your deliberations." One hour later, at approximately 4:00 p.m., the jury reached its verdict that the mitigating factors did not outweigh the aggravating factor.

The Code of Criminal Justice, *N.J.S.A.* 2C:11–3c(3), provides:

The jury or, if there is no jury, the court shall return a special verdict setting forth in writing the existence or non-existence of each of the aggravating and mitigating factors set forth in paragraphs (4) and (5) of this subsection. If any aggravating factor is found to exist, the verdict shall also state whether it is or is not outweighed by any one or more mitigating factors.

(a) If the jury or the court finds that any aggravating factor exists and is not outweighed by one or more mitigating factors, the court shall sentence the defendant to death.

(b) If the jury or the court finds that no aggravating factors exist, or that any aggravating factors which exist are outweighed by one or more mitigating factors, the court shall sentence the defendant pursuant to subsection b.

(c) If the jury is unable to reach a unanimous verdict, the court shall sentence the defendant pursuant to subsection b.

Construing these provisions in *Ramseur*, we found it "clear that the Legislature contemplated three possible final verdicts in a capital case: a unanimous verdict that results in imprisonment, a unanimous verdict that results in death, and a non-unanimous verdict that results in imprisonment." 106 *N.J.* at 301.

In *Ramseur, supra,* 106 *N.J.* at 302, we rejected the defendant's contention that the court should not have directed the jury to continue deliberating in the face of the jury's request for further advice. There, after deliberating for approximately four hours, the jury sent a note to the trial court that stated, "[j]ury unable to reach a unanimous decision. Suggestions please." *Id.* at 301. We found that the trial court did not abuse its discretion in concluding that the statement requesting suggestions "clearly indicated the jury did not regard itself as deadlocked." *Id.* at 302. We added, however, that "perhaps the trial court should have explored with the jury whether it had deliberated sufficiently and had reached a genuine stalemate, a point at which any further deliberations would have been counterproductive." *Id.* at 304.

In the instant case, unlike in *Ramseur*, the note did not clearly indicate that "the jury did not regard itself as deadlocked." *Id.* at 302. It simply stated that the jury could not come to a unanimous verdict, and did not seek further suggestions or instructions. Under these circumstances, the trial court should have asked whether the jury's note indicated its final verdict or whether the jury wanted more time to deliberate. *See Lowenfield v. Phelps*, 484 *U.S.* 231, ——, 108 *S.Ct.* 546, 552, 98 *L.Ed.*2d 568, 579 (1988) (approving of an inquiry about whether "further deliberations might assist them" after jury indicated an inability to reach a unanimous verdict).

In addressing coercive supplemental instructions, we have held that "[h]aving erroneously been deprived of a substantial opportunity to receive a jury verdict resulting in imprisonment rather than death, the defendant may not be subject to another capital sentencing proceeding." *Ramseur, supra*, 106 *N.J.* at 313. Because the jury may have decided that it could not agree on the imposition of the death penalty, we likewise regard it as "intolerably unfair," *id.* at 314, to subject the defendant to a second capital offense proceeding. If the trial court had asked the right question, it might have learned the jury had reached a final verdict resulting in imprisonment rather than death. We are concerned that absent the trial court's error, there was "not merely a theoretical possibility but a substantial likelihood," that a non-unanimous verdict would have been returned. *Ibid.* Confronted with that likelihood, we cannot require defendant to run the risk that a different jury might decide he should die. On remand, defendant may not again be subjected to the death penalty. *See Bey II, supra*, 112 *N.J.* at 180–81 (remanding for a second capital sentencing proceeding even though coercive supplemental instructions given because the jury never indicated "a substantial likelihood that, absent the error, [it] would have reached a verdict resulting in imprisonment rather than death") (quoting *Ramseur, supra*, 106 *N.J.* at 314).

b. *Jury Coercion*

Defendant also contends that the effect of the court's instructions was to coerce the jury into reaching a unanimous verdict, contrary to the legislative scheme. In the penalty-phase summation, defendant's counsel emphasized that non-unanimity in the weighing process would result in a sentence of imprisonment. Counsel repeatedly told the jurors that "[o]ne of you is all I need." In the original penalty charge, the court informed the jury that it could return three possible verdicts, one of which was a non-unanimous verdict that would result in a sentence of imprisonment. Thereafter, the prosecution request-

ed that the court read a proposed instruction to the jury concerning the need to reach a unanimous verdict. The trial court rejected that request, but added the following charge:

[I]n response to some comments made during the closing by counsel, I would like to impress upon you that the purpose of a jury deliberating is to reach an agreement. I cannot impress that upon you too forcefully or any more forcefully than I have. That is the purpose of deliberations. And you are to exercise your best judgment, listen to the arguments of each juror. You may have an opinion. You may even change your opinion after listening to some of the arguments of your fellow jurors.

You embark upon the same course of conduct that you embarked upon in the guilt phase of the case. Deliberate by the exercise of good faith and judgment. Hopefully, no one is going to be strong-headed without reason. No one is asking anyone to give up their good conscience if they so believe, but again the purpose of deliberations is to try to reach an agreement if you can.

These were the last words the jury heard before it began deliberating.

When it sent its note in response to the one from the jury, the court did not remind the jury that it could fulfill its obligations by returning a final non-unanimous verdict. Defendant now contends that the combined effect of the court's supplemental charge and the absence of the reminder was to coerce the jury into returning a unanimous verdict. We agree.

We considered a similar contention in *Ramseur, supra,* 106 *N.J.* at 304, where, as here, the trial court, in its original charge, informed the jury of its three possible verdicts and the consequences of each one. After the jury announced it could not reach unanimity, however, the court gave three separate supplemental charges that did not remind the jury of the option of a final non-unanimous verdict. Rather, the supplemental charges stressed the importance of reaching a unanimous verdict and suggested that by failing to attain unanimity, the jurors were "betraying their oaths as jurors and shirking their responsibilities as citizens." *Id.* at 307. We concluded that the supplemental charge in that case coerced the jury to believe that a unanimous verdict was its only choice. *Id.* at 308.

In a capital case, unlike the ordinary criminal prosecution, jurors need not reach a unanimous verdict. Thus, a

decision not to agree is a legally acceptable outcome, which results not in a mistrial, but in a final verdict. *Id.* at 308. For this reason, trial courts should not charge juries in the penalty phase on the importance of reaching a unanimous verdict. *Ibid.* As long as one juror believes that the aggravating factors do not outweigh the mitigating factors, the jury must not impose the death penalty. *Mills v. Maryland,* 486 *U.S.* 367, ——, 108 *S.Ct.* 1860, 1865–66, 100 *L.Ed.*2d 384, 393–95 (1988). As we admonished in *Ramseur,* "juries in capital cases [must] be informed of, and free to exercise, their statutory option to return a final, non-unanimous verdict resulting in imprisonment if, after a reasonable period of deliberations, they are unable to agree." *Id.* at 312. As we stated in *Bey II,*

> [t]o prevent unacceptable speculation about the consequences of a non-unanimous verdict, the court must inform the jury of its option of returning a final, non-unanimous verdict that would result in a minimum of thirty years of imprisonment without parole. In addition to that instruction, the special verdict forms provided to the jury should include as a possible verdict the inability of the jury to reach a unanimous decision. [112 *N.J.* at 180.]

Here, the verdict sheet did not provide the jury with the alternative of indicating that it had decided to reach a non-unanimous verdict. The only options on the sheet were whether or not the aggravating factors were equal to or outweighed the mitigating factors.[2] In fairness to the trial court, it did not

---

[2]As completed by the jury, the verdict sheet stated:

SPECIAL VERDICT FORM

STATE OF NEW JERSEY Indictment 1689–8–83

 V.

JAMES IRVING HUNT

AGGRAVATING FACTOR

Do you unanimously find beyond a reasonable doubt that the following aggravating factor exists?

(check the appropriate answer)

1. That the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of the mind, or an aggravated battery to the victim.

 yes ✓ no 

have the benefit of our opinions in *Ramseur* and *Bey II* at the time of trial in the present case.

Consistent with our prior declarations, the purpose of deliberations in the penalty phase is not to reach agreement but to deliberate. Jurors should discuss the existence of aggravating and mitigating factors and whether the aggravating outweigh the mitigating factors beyond a reasonable doubt. They should exchange views and reflect not only on their own thoughts, but those of the other jurors. That kind of delibera-

---

### MITIGATING FACTORS

Do you find that the following exist as mitigating factors?

(check the appropriate answer)

1. The age of the defendant at the time of the murder.

 yes __✓__ no _____

2. The defendant has no significant history of prior criminal activity.

 yes __✓__ no _____

3. The defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution.

 yes __✓__ no _____

4. Any factor which is relevant to the defendant's character or record or to the circumstances of the offense.

 yes __✓__ no _____

If you have checked the aggravating factor "yes" and any mitigating factor "yes", then complete the following.

THIS DECISION MUST BE UNANIMOUS.

1. Do you find that the mitigating factor(s) outweigh the aggravating factor?

 (please check one)

 yes _____ no __✓__

2. If you have checked "no" to the previous question, do you find that the mitigating factor(s) and the aggravating factor are of equal weight?

 (please check one)

 yes _____ no __✓__

 (signature of Rhoda E. King)
 FOREPERSON

tion enables jurors to reflect upon their own opinion of the appropriateness of sentencing the defendant to death, and it assures the public that the ultimate verdict represents an informed and considered judgment. In a penalty-phase hearing, the court may instruct the jurors to consult with one another, but the court must clearly inform the jury that a decision to disagree is permissible. *Ramseur, supra,* 106 *N.J.* at 312. When the jury notifies the court that it cannot agree, instructions to continue deliberating should follow not from a desire to produce unanimity, but to assure that the jury has deliberated sufficiently to assure confidence in the ultimate verdict, whether or not it is unanimous.

This jury may have reached a final non-unanimous verdict. The failure to ascertain the meaning of the jury's inquiry deprived defendant "of a substantial opportunity to receive a verdict resulting in imprisonment rather than death." *Id.* at 313. At a minimum, the court should have inquired whether the jury's note was intended as a final verdict. If the jury did not clearly indicate that it regarded itself as deadlocked, and the court concluded that further deliberations would be helpful, the court should have reminded the jury of its option of returning a final non-unanimous verdict.

For this additional reason, we reverse defendant's death sentence and remand the matter for the imposition of a non-death sentence.

### 2. *Aggravating Factor—c(4)(c)*

In the penalty phase, the State relied on a solitary aggravating factor, Section c(4)(c). The State relied solely on the evidence produced during the guilt phase, and did not introduce any additional evidence at the penalty phase hearing. As previously indicated, the defendant offered expert testimony to support his argument that he was under extreme mental or emotional disturbance, *N.J.S.A.* 2C:11–3c(5)(a), as well as his own testimony and that of members of his family to establish

his devotion to them and his reliability as a worker under the "catch-all" factor, *N.J.S.A.* 2C:11–3c(5)(h). In his summation, the prosecutor argued that the evidence of twenty-four stab wounds was sufficient to support the existence of aggravating factor c(4)(c):

> Now, torture is a subjective thing. Terror, pain, suffering. But we have objective evidence, indicia of it here, don't we?
>
> In the description of the crime scene, the blood-spattered walls, the bloody trail leading from one end of the apartment to the other. The pictures of Mr. Lawson and what was done to him. The testimony of the Medical Examiner as to the wounds. And don't we have the evidence of the terror in a man running for his life through his own home, humble as it may be? The terror of a man already dead, already fatally wounded in the chest? Yet somehow running for his life through his own home with James Hunt slashing at him? Don't we have the terror of a man sitting there slumped in his bathroom watching his own blood ooze out of him?
>
> Pain and suffering. Don't we have evidence of the pain and the suffering caused by 24 stab wounds? Some superficial but superficial is after all a medical term to Mr. Lawson. They hurt. They cause bleeding. They have to have caused terror.
>
> Torture is subjective. But we have torture on an aggravated battery. And don't we have, ladies and gentlemen, proof beyond any doubt of not one but 24 aggravated batteries? Take out the one wound that in and of itself of the many would have caused his death. Don't we have proof beyond any doubt of numerous aggravated batteries? And the statute requires an especially vicious crime because of torture or an aggravated battery.

The trial court charged the jury on the section c(4)(c) factor as follows:

> For the purpose of this case you may only consider whether the following alleged aggravating factor exists. The reason I say that is because the State is only proceeding on one aggravating factor. That factor is as follows: that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture or an aggravated battery to the victim.
>
> The victim in this case, of course, was Stoney Lawson.
>
> \* \* \* \* \* \* \* \*
>
> The prosecution is not proceeding on that particular theory of depraved mind or that the attack was so savagely brutal or outrageously cruel and violent that in your minds the words or phrases "wantonly vile, horrible or inhuman" are justified.

As previously indicated, the jury found that aggravating factor c(4)(c) existed, thereby bringing into focus the four

mitigating factors. The jury also concluded that the aggravating factor was not outweighed by the mitigating factors.

In *Ramseur*, we recognized that all murders presumably will be perceived as "outrageously or wantonly vile, horrible or inhuman." Consequently, we provided a narrowing construction of c(4)(c) to guide the jury's discretion. 106 *N.J.* at 198. Otherwise, (c)(4)(c) would violate the requirement that a capital sentencing scheme must provide a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many in which it is not," *Furman v. Georgia*, 408 *U.S.* 238, 313, 92 *S.Ct.* 2726, 2764, 33 *L.Ed.*2d 346, 392 (1972) (White, J., concurring), and the requirement that the jury's discretion "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 *U.S.* 153, 189, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.*2d 859, 883 (1976); *see also Godfrey v. Georgia*, 446 *U.S.* 420, 428, 100 *S.Ct.* 1759, 1765, 64 *L.Ed.*2d 398, 406 (1980) (There is nothing in the words "outrageously or wantonly vile, horrible or inhuman" standing alone, "that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence.").

These considerations led us to conclude in *Ramseur* that the essence of the legislative concern is the defendant's state of mind. We do not believe that the Legislature intended to distinguish between two murderers each of whom intended to inflict immediate death upon the victim without any additional suffering whatsoever, when one victim dies immediately and the other lives for a long period of time and experiences excruciating pain. That capricious event alone would be perceived as an insufficient basis on which to inflict death on that defendant while imposing imprisonment on the other. [106 *N.J.* at 207.]

Consequently, we excised the first part of that section —that the murder was outrageously or wantonly vile, horrible or inhuman—and confined section c(4)c to the second part—that the murder "*involved* torture, depravity of mind, or an aggravated battery to the victim." *Id.* at 199. This led us to conclude that the terms "torture" and "aggravated battery" were identical in purpose. Both of these factors exist if the defendant "intended to, and did in fact, cause extreme physical

or mental suffering—in addition to death." *Id.* at 208. In other words, "the extreme physical or mental suffering must be precisely what defendant *wanted* to occur in addition to death." *Id.* at 208–09. "Depravity of mind," as we have construed it, distinguishes "those who murder without purpose or meaning * * * from those who murder for a purpose (albeit a completely unjustified purpose)." *Id.* at 209. To find depravity of mind, the jury must unanimously agree that "the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing." *Id.* at 211. Depravity of mind can also be found from evidence of mutilation of the victim after death. *Id.* at 209–10 n. 37.

 As the charge reveals, the trial court initially focused on whether the murder was "outrageously or wantonly vile, horrible or inhuman," rather than on whether the defendant intended to inflict extreme physical or mental pain on Lawson in addition to death. To this extent, the trial court used the definition that we subsequently found unconstitutional in *Ramseur*. This instruction provides another ground for a reversal of the defendant's death penalty.

Defendant additionally contends that the State has failed to proffer sufficient evidence that his murder of Lawson involved either "torture" or an "aggravated battery." We addressed a similar contention in *Ramseur*. There, the defendant walked away from his bleeding victim but returned within a couple of minutes, told the victim that he was going to kill her grandchildren, and then inflicted the fatal stabs. 106 *N.J.* at 288. From that conduct, we found that a jury could infer "that Ramseur, in addition to purposely killing the victim, also purposely inflicted severe mental pain prior to her death." *Ibid.*

By contrast, the evidence here is that Lawson was stabbed twenty-four times, was shocked by the attack, and bled for twenty minutes before dying. The State relies solely on the twenty-four stab wounds, which the prosecutor described on

summation as "24 aggravated batteries," to establish aggravating factor c(4)(c). The apparent motivation for the attack was to avenge the victim's physical abuse of defendant's sister. So viewed, this murder was not committed for the pleasure of killing, see Ramseur, supra, 106 N.J. at 211, but for revenge.

Our concern is that if the c(4)(c) factor could be sustained on this evidence alone, there would be "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." Godfrey, supra, 446 U.S. at 433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409. In another case, the nature and number of wounds might bespeak an intent to inflict pain in addition to causing death. For example, multiple stab wounds, when combined with other evidence of defendant's intent, could support the contention that defendant knew or intended that the victim would suffer or that defendant wanted the victim to know that he or she was about to be murdered. Because the State is barred on other grounds from seeking the death penalty, we need not determine whether the proof of aggravating factor c(4)(c) was insufficient to support submission of that factor to the jury.

We reverse the imposition of the death penalty, affirm the defendant's conviction for murder, and remand the matter to the Law Division for the imposition of a non-capital sentence.

HANDLER, Justice, dissenting.

The defendant in this case, James I. Hunt, was convicted of the murder of Edward Lawson and thereafter sentenced to death. He filed a direct appeal challenging both the conviction and the sentence. This Court affirms defendant's conviction for Lawson's murder and related offenses but reverses the imposition of the death penalty. The Court further concludes that because of circumstances relating to jury coercion, the defendant cannot again be exposed to the death sentence.

I concur in the Court's reversal of the death sentence and its determination that the defendant cannot once again face the

death penalty. However, I disagree with the Court's refusal to set aside the defendant's murder conviction.

I again express my fundamental differences with the Court with respect to the validity of the New Jersey capital murder-death penalty statute on state constitutional and fundamental fairness grounds. *See, e.g., State v. Williams (II)*, 113 *N.J.* 393, 458–61 (1988) (Handler, J., dissenting); *State v. Rose*, 112 *N.J.* 454, 562–67 (1988) (Handler, J., dissenting). I need not repeat those positions. Nevertheless, in this case, I feel that it is important to address three issues, namely, the use of death-qualified jurors in the trial of the issue of guilt in capital causes; the failure to give the jury proper instructions concerning the offense of serious-bodily-injury murder as required under *State v. Gerald*, 113 *N.J.* 40 (1988); and the validity and application of the standards that govern one of the statute's aggravating factors that is invoked to determine death eligibility: *N.J.S.A.* 2C:11–3c(4)(c) ("c(4)(c)").

## I.

The defendant challenges the empanelling of the jury in this case on a number of grounds. These contentions and the Court's disposition of them are presented in its opinion. *Ante* at 347–364. Among the contentions raised by the defendant is that use of a death-qualified jury during the guilt phase of his bifurcated trial and the death-qualification process itself are unconstitutional. *Ante* at 355–356. The majority, without discussion, summarily rejects these contentions. *Ante* at 356. I believe the state of the record as well as evolving authority demand a fuller consideration of these contentions. There are, in my view, strong reasons for invalidating or modifying the death-qualification process in the prosecution of capital cases and for developing alternative jury and trial procedures to overcome the prejudice inherent in the current use of death-qualified juries.

## A.

The defendant contends that the death-qualification process, which requires potential jurors to express, prior to the guilt phase, their ability to return a death sentence, deprived him of the right to an impartial jury. The death-qualification process itself, according to defendant, improperly conditions jurors to a predisposition, prior to the actual guilt-phase trial, that the defendant is guilty of murder.

There is in this case some factual substance to the defendant's complaint that the death-qualified jury was, indeed, conviction-prone. The Court acknowledges that of the eighty-eight potential jurors who were not excused for reasons unrelated to their views on the death penalty, twenty-two, or 25%, were excused because of their opposition to the death penalty, while only six, or 6.8%, were excused because they would automatically impose the death penalty on all persons convicted of murder. *Ante* at 356. These statistics graphically underscore the pervasive awareness on the part of jurors of the realistic need to deal with the imposition of the death penalty at some time during the trial. This awareness saturated the selection process and indicates that a jury thus selected will be unduly sensitized and conditioned to the defendant's guilt.

In meeting defendant's contention, the Court contents itself with its rather conclusory determination in *State v. Williams (II), supra,* 113 *N.J.* 393. There it observed that as long as the trial court ascertains that each juror will apply the law, and that each juror understands both the presumption of innocence and the State's burden to prove the defendant guilty beyond a reasonable doubt, allegations of conviction-proneness may be regarded as exaggerated or illusory. *Id.* at 414 n. 6. Reiterating *Williams (II),* the Court states that "[s]ince a properly instructed jury can understand that death qualification is based on a hypothetical finding of guilt, and nothing more, we believe that the risk of prejudice to the guilt-innocence phase is minimal." *Ante* at 356.

This cavalier conclusion fails to give any weight to the indications that, in addition to selecting for service jurors whose attitudes are more punitive than those who are death-scrupled, the process of death qualification itself engenders partiality among the jurors. The selection process, I believe, underscores the issue of the imposition of the death penalty itself. *State v. Bey (II)*, 112 *N.J.* 123, 192 (1988) (Handler, J., dissenting) (citing Haney, "On the Selection of Capital Juries: The Biasing Effects of the Death Qualification Process," 8 *Law & Hum. Behav.* 121 (1984)). The entire process has a strong gravitational pull in the direction of guilt. It confronts potential jurors with an atmosphere charged with the likelihood of guilt, rather than "a hypothetical finding of guilt, and nothing more." As Justice O'Hern observed, one cannot read the transcript of a death-qualifying *voir dire* proceeding without a sense of "impending doom." *See State v. Ramseur*, 106 *N.J.* 123, 341 (1987) (O'Hern, J., concurring) (quoting *Hovey v. Superior Court of Alameda County*, 28 *Cal.* 3d 1, 70–71, 616 *P.* 2d 1301, 1348, 168 *Cal.Rptr.* 128, 175 (1980)). Minimally, therefore, the jury in the trial of a capital cause should be death-qualified only if and when it becomes necessary to determine whether the death penalty should be imposed.

### B.

I continue to disagree with the position that the use of a death-qualified jury in a bifurcated trial of a capital case is valid under state-constitutional and fundamental-fairness standards. *See State v. Bey (II), supra*, 112 *N.J.* at 191–98 (Handler, J., dissenting). This Court, in *Ramseur*, without extended reasoning, chose to follow the decision in *Lockhart v. McCree*, 476 *U.S.* 162, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986), where the Supreme Court ruled that it was not unconstitutional for a death-qualified jury to determine a defendant's guilt in a capital case. *Ramseur, supra*, 106 *N.J.* at 248–54. I disagreed, noting the continuing social-science research that strongly suggests that persons who favor the imposition of the death

penalty may have more punitive attitudes than those who
disfavor the death penalty. *Id.* at 431 (Handler, J., dissenting).
I have pointed out more recently in *State v. Bey (II), supra,* 112
*N.J.* at 191, that the literature appearing since *McCree* buttress-
es the conclusion that death-penalty proponents are conviction-
prone, citing Seltzer, Lopes, Dayan, and Canan, "The Effect of
Death Qualification on the Propensity of Jurors to Convict: The
Maryland Example," 29 *How. L.J.* 571 (1986). There is, in my
view, enough evidence to justify abandonment or, at the very
least, modification of the current death-qualified jury method-
ology in the trial of capital cases.

I struggle in vain to identify cogent reasons to explain the
Court's position on this fundamental issue. In *Ramseur,* in
*Bey (II),* in *Williams (II),* and now in this case, the Court
refuses to come to grips with the clearly disturbing implications
created by using a death-qualified jury. Its passive acceptance
of the Supreme Court's lead on this fundamental issue is both
baffling and unsettling for several reasons.

First, the Court gravely misunderstands the weight that a
state should attribute to the federal constitution with respect to
the criminal law of capital-murder. The Supreme Court itself
has repeatedly adjured states to look to their own constitutions
and laws. *See California v. Ramos,* 463 *U.S.* 992, 1013–14, 103
*S.Ct.* 3446, 3459–60, 77 *L.Ed.*2d 1171, 1188–89 (1983). Conse-
quently, this Court's frequent attempts to clone the federal
constitution to determine and define critical capital-murder is-
sues and rights is more than a doctrinal distraction. It has
become a major barrier to the development of a cohesive body
of substantive and procedural law to govern the prosecution of
these complex and unique causes.

Second, in terms of capital-murder jurisprudence, the Su-
preme Court's approach boarders on the chaotic. For example,
we have only recently rejected the federal court's own shifting
constitutional analysis of what culpable state of mind is neces-
sary in order for a murder to rise to the level of a capital

offense. *E.g., Gerald, supra,* 113 *N.J.* at 69–91. We most emphatically pronounced that protections under the New Jersey Constitution are different from and greater than those under the federal Constitution. *Id.* at 76. Yet, in *Ramseur,* on the equally important issue of fair and impartial juries, the Court said that "the protections regarding death qualification afforded under the New Jersey Constitution are no different from or greater than those under the federal Constitution." 106 *N.J.* at 251. It should be apparent that the Court has become engaged in the random selection of constitutional protections, sometimes federal, sometimes state; its approach to capital-murder jurisprudence is becoming indistinguishable from the federal approach in its lack of consistency.

Third, and most importantly, because of the Court's reflexive recourse to the federal experience, the protections that the Court ultimately chooses are ironically drained of vigor. The Court's approach fails woefully to appreciate just how minimal are the protections of the federal constitution in capital-murder law. This is true, for example, with respect to a defendant's constitutional interest in jury impartiality, an important issue in this case. Thus, in *Buchanan v. Kentucky,* 483 *U.S.* 402, 107 *S.Ct.* 2906, 97 *L.Ed.*2d 336 (1987), the Supreme Court, in the trial of a defendant not charged with capital murder, upheld the use of a death-qualified jury because he was being tried jointly with a defendant charged with capital murder. The Court approved this practice for reasons of prosecutorial convenience, despite its perception that " 'death qualification' in fact produces juries *somewhat* more 'conviction-prone' than 'non-death-qualified' juries'..." 483 *U.S.* at 415 n. 16, 107 *S.Ct.* at 2913 n. 16, 97 *L.Ed.*2d at 350 n. 16. This attitude departs radically from our own insistence on jury impartiality. *See, e.g., State v. Corsaro,* 107 *N.J.* 339, 352–53 (1987); *State v. Ragland,* 105 *N.J.* 189, 195–96 (1986); *State v. Ingram,* 98 *N.J.* 489, 500 (1985); *State v. Collier,* 90 *N.J.* 117, 124 (1982); *State v. Ingenito,* 87 *N.J.* 204, 216–17 (1981); *State v. Czachor,* 82 *N.J.* 392 (1980); *State v. Simon,* 79 *N.J.* 191 (1979). Our commit-

ment to jury impartiality is not a recent development. It is deeply embedded in our tradition of criminal justice, appropriately heightened in capital-murder prosecutions. Historically, this Court has understood that "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *State v. Kociolek,* 20 *N.J.* 92, 105 (1955) (quoting *Mattox v. United States,* 146 *U.S.* 140, 149, 13 *S.Ct.* 50, 53, 36 *L.Ed.* 917, 921 (1892)); *see State v. Jackson,* 43 *N.J.* 148, 158 (1964), *cert.* den. *sub nom. Ravenell v. New Jersey,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965); *State v. Mount,* 30 *N.J.* 195, 212–13 (1959). It is difficult to imagine an "external cause" that would tend more to "disturb the deliberate and impartial judgment" of the jury than death qualification, which both selects a more punitive jury and conditions that jury to believe that the defendant is guilty.

In matters surrounding the fairness and impartiality of jurors, perhaps more so than with respect to other fact-sensitive and evidentiary aspects of a criminal trial, we are entitled to draw on common sense grounded in ordinary human experience. In the selection of a jury, we are not dealing with threshold questions entailing the competence or admissibility of evidence. Courts are not, therefore, remitted to determinations that must be informed only by the kind of knowledge that satisfies rigorous scientific standards. Thus, on the issue of death qualification, we should be able to rely on our common sense and knowledge concerning the fairness of ordinary persons of average experience, particularly when this knowledge is further informed by studies demonstrating the conviction-proneness of death-qualified juries. Under our jurisprudence, that risk of jury unfairness should be enough to compel the State to develop alternatives. There is, in my estimation, a strong constitutional impetus to explore and develop a better way.

## C.

There are alternatives to the current death-qualification methodology of trying capital causes. *See, e.g.,* Berry, "Remedies to the Dilemma of Death–Qualified Juries," 8 *U. Ark. Little Rock L.J.* 479 (1985) (hereafter "Remedies"); Comment, "Inequities and Abuses of Death Qualification: Causes and Cures," 23 *S.D.L. Rev.* 281 (1987). One realistic alternative is the use of dual juries, which can be adapted from current experience.

The multiple-jury procedure is not a concept wholly alien to our system of jurisprudence. It has been developed primarily as a solution to the dilemma posed by the United States Supreme Court's decision in *Bruton v. United States,* 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476 (1968).[1] *See State v. Corsi,* 86 *N.J.* 172, 176 (1981). Under this procedure, two juries are impanelled separately, each with a separate responsibility to determine the guilt or innocence of a particular defendant. The juries, however, are seated together for the presentation of all matters, including the introduction of evidence or testimony, that are relevant to both defendants. Conversely, each jury is excused from the presentation of such matters that would be irrelevant or inadmissible in the trial of the particular defendant for which it is responsible. Thus, common or overlapping matters, that is, matters relevant to both trials, need be presented only once, resulting in a substantial savings of time and enhancing the likelihood of consistent results, without prejudicing either party. Gaynes, "Two Juries/One Trial: Panacea of Judicial Economy or Personification of Murphy's Law," 5 *Am. J. Trial Advoc.* 285 (1981).

---

[1]That case involved a joint trial of Bruton and a codefendant at which the government introduced into evidence the oral confession of the nontestifying codefendant implicating Bruton. The Supreme Court held that because Bruton could not effectively cross-examine the confession of the nontestifying codefendant, its admission violated Bruton's sixth amendment right of confrontation.

While the *Bruton* mandate is the major reason for employing multiple juries, the procedure has also been used to minimize prejudice at a joint trial of codefendants who assert antagonistic or inconsistent defenses. *See People v. Kramer*, 103 *Mich.App.* 747, 303 *N.W.*2d 880 (1981); *People v. Brooks*, 92 *Mich.App.* 393, 285 *N.W.*2d 307 (1979).[2] It has also been proposed for use in complex litigation where the laws of two or more states must be applied. *See Martin v. Bell Helicopter*, No. 77–F–533 (U.S.Dist.Ct., Colo., Feb. 21, 1980) (*see* 66 *A.B.A. J.* 787 (1980)) (case settled prior to actual use of multiple juries).

The advantages of the multiple-jury procedure have spurred many courts to approve it. *See, e.g., United States v. Hayes*, 676 *F.*2d 1359, 1366–67 (11th Cir.), *cert.* den., 459 *U.S.* 1040, 103 *S.Ct.* 455, 74 *L.Ed.*2d 608 (1982); *United States v. Rimar*, 558 *F.*2d 1271 (6th Cir.1977), *cert.* den., 435 *U.S.* 922, 98 *S.Ct.* 1484, 55 *L.Ed.*2d 515 (1978); *United States v. Rowan*, 518 *F.*2d 685, 689–90 (6th Cir.), *cert.* den. *sub nom. Jackson v. United States*, 423 *U.S.* 949, 96 *S.Ct.* 368, 46 *L.Ed.*2d 284 (1975); *United States v. Sidman*, 470 *F.*2d 1158 (9th Cir.1972), *cert.* den., 409 *U.S.* 1127, 93 *S.Ct.* 948, 35 *L.Ed.*2d 260 (1973); *People v. Wardlow*, 118 *Cal.App.*3d 375, 382–387, 173 *Cal.Rptr.* 500, 502–05 (1981); *People v. Brooks*, 92 *Mich.App.* 393, 285 *N.W.*2d 307 (1979). The multiple-jury procedure has even been approved for use in a capital-murder prosecution of codefendants posing a *Bruton*-type problem. *State v. Beam*, 109 *Idaho* 616, 710 *P.*2d 526 (1985), *cert.* den., 476 *U.S.* 1153, 106 *S.Ct.* 2260, 90 *L.Ed.*2d 704 (1986).[3]

---

[2]The difficulty that arises in a joint trial in these cases is that the State has effectively pitted one defendant against the other with each trying to save himself at the other's expense; the result is that the prosecutor is relieved of his burden of proof. *People v. Hurst*, 396 *Mich.* 1, 7, 238 *N.W.*2d 6, 10 (1976). The multiple-jury procedure resolves this inequity because each defendant's jury hears none of the evidence presented by his codefendant.

[3]Some State courts have discouraged the use of the multiple-jury procedure. *See, e.g., State v. Lambright*, 138 *Ariz.* 63, 673 *P.*2d 1 (1983), *cert.* den., 469 *U.S.*

This procedure can be adapted to the trial of a capital-murder case. The prosecution of the case would remain bifurcated; the guilt and penalty issues to be tried sequentially. Under such a procedure, a defendant's guilt or innocence would be determined by a jury that is empanelled under the standards controlling the selection of juries in ordinary criminal cases; such jurors would not be death-qualified. A second jury, duly death-qualified, would also be empaneled to determine the issue of the imposition of the death penalty. Because evidence probative of guilt is also probative of penalty, the guilt phase of the prosecution would be tried before both juries. The former jurors would determine guilt or innocence of murder and death-eligibility. In the event this jury determined the defendant not guilty of capital murder, *i.e.*, that the defendant was guilty of a lesser form of murder or another form of homicide, the second jury would be discharged. The trial court would then determine the sentence as in an ordinary non-capital case. If the first jury determined that the defendant was guilty of capital murder, the sentencing phase of the prosecution would then be tried only before the second, death-qualified jury. This jury would determine the appropriate sentence based on the evidence adduced during the guilt-phase trial, including the defendant's conviction, as well as the evidence presented during sentencing-phase trial. In sum, under such a procedure, the issue of defendant's guilt would be determined by a conviction-neutral jury uninfluenced by the death-qualification process. The defendant's sentence would be determined by a death-qualified jury.

---

892, 105 *S.Ct.* 267, 83 *L.Ed.*2d 203 (1984); *People v. Williams*, 93 *Ill.*2d 309, 67 *Ill.Dec.* 97, 444 *N.E.*2d 136 (1982), *cert.* den., 467 *U.S.* 1218, 104 *S.Ct.* 2666, 81 *L.Ed.*2d 371 (1984); *Scarborough v. State*, 50 *Md.App.* 276, 278–81, 437 *A.*2d 672, 674–76 (1981). However, the primary reason for such disapproval appears to stem from the risk that either counsel or the court would unintentionally disclose inadmissible information to the "wrong" jury, which could constitute reversible error. *See, e.g., People v. Rainge*, 112 *Ill.App.*3d 396, 68 *Ill.Dec.* 87, 92, 445 *N.E.*2d 535, 550 (1983). This, however, is not a problem in the context of a capital-murder prosecution involving one defendant.

There are, of course, differences in the use of a multiple-jury procedure in a capital prosecution from its use in other settings. In a *Bruton*-type case, the concern is that a single jury cannot constitutionally hear and review evidence presented at a joint trial of codefendants when such evidence implicates a non-testifying defendant. Thus, in these cases, each jury is excused with respect to evidence or other matters that is not admissible in the trial in which it must determine guilt or innocence. In contrast, the rationale for employing multiple jurors in capital cases would be to avoid the determination of a defendant's guilt or innocence by a jury programmed through the process of death qualification to return a verdict of guilty. This can be achieved by delegating the responsibility for determining guilt only to a non-death-qualified jury. Moreover, only after the non-death-qualified jury rendered a verdict of guilty of capital murder would the death-qualified sentencing jury exercise its responsibility for determining the penalty. There would be no need to continue the participation of the guilt-phase jury in the sentencing trial.

There undoubtedly are complicating considerations in such a procedure. Some critics have maintained that the use of two juries in a capital case, one to determine guilt and one punishment, results in a division of responsibility that dilutes accountability. *See Grigsby v. Mabry*, 758 *F.*2d 226, 247 (1985) (Gibson, J., dissenting), rev'd, *Lockhart v. McCree*, 476 *U.S.* 162, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986). Because the guilt-phase jury does not actually render a sentence of death, arguably some jury members may feel less restrained in finding guilt because the responsibility for deciding the ultimate sentence is passed on to the sentencing jury. *See* Crump, "Lockhart v. McCree: The 'Biased But Unbiased Juror,' What are the State's Legitimate Interests?," 65 *Den. U.L. Rev.* 1, 19 (1988); Berry, *Remedies, supra*, 8 *U.Ark. Little Rock L.J.* at 499–500.

The point is esoteric. In the overwhelming majority of criminal cases in this country sentencing is undertaken by the court; jury sentencing is the exception to the rule. In fact, in non-cap-

ital cases, jury sentencing occurs in only seven states. III *American Bar Association Standards for Criminal Justice* Ch. 18, § 1.1, at 20 (2d ed.1980). Hence, in the typical case, the jury is often admonished *not* to concern itself with the sentencing consequences of its determination of guilt. Moreover, even in capital cases, where the penal stakes are the highest, a number of state statutory schemes provide that after a jury trial on guilt, the court alone is to impose the sentence. Also, some states permit the trial court to override the sentencing verdict of the jury.[4] In our own state, we permit the court "for good cause" in a capital case to discharge the jury that presided at trial and empanel a new jury for the penalty phase. *N.J.S.A.* 2C:11-3(c)(1).

An equally tenuous objection relates to juror nullification; arguably, jurors in capital cases can intentionally, albeit wrongfully, acquit a defendant. It is surmised that such jurors, because of their aversion to the death penalty, would automatically acquit any capital defendant despite the compelling nature of the evidence of guilt. Note, "Lockhart v. McCree: Death Qualification as a Detriment of the Impartiality and Representativeness of a Jury in Death Penalty Cases," 72 *Cornell L.Rev.* 1075, 1106-07 (1987).

This argument exaggerates the significance of "jury nullification" in the context of capital-murder prosecutions. It is a phenomenon that attends all criminal causes. "[A] jury has the prerogative of returning a verdict of innocence in the face of overwhelming evidence of guilt." *State v. Ingenito, supra,* 87

---

[4]In Nevada, the jury is given responsibility for imposing the sentence in a capital case, but if the jury cannot agree, a panel of three judges may impose the sentence. Nev.Rev.Stat. § 175.556 (1987). In Arizona, Idaho, Montana, and Nebraska, the court alone imposes the sentence. Ariz.Rev.Stat.Ann. § 13-703 (Supp.1987); Idaho Code § 19-2515 (1987); Mont.Code Ann. § 46-18-301 (1987); Neb.Rev.Stat. § 29-2522 (1985). Alabama, Florida, and Indiana actually allow a judge to override a jury's recommendation of a life sentence. Ala.Code § 13A-5-46 (1988); Fla.Stat. § 921.141(3) (1985); Ind. Code § 35-50-2-9(e)(2) (Supp.1985).

*N.J.* at 212. Such a verdict in favor of the criminal defendant, even in a death-penalty case, is subject to neither review nor reversal. *See McCleskey v. Kemp*, 481 *U.S.* 279, 311, 107 *S.Ct.* 1756, 1777, 95 *L.Ed.*2d 262, 291 (1987). Acquiescence in this jury prerogative is influenced by the belief that in a criminal proceeding the jury serves as the conscience of the community. *See, e.g., United States v. Quarles*, 350 *U.S.* 11, 18–19, 76 *S.Ct.* 1, 5–6, 100 *L.Ed.* 8, 15 (1955); *Ingenito*, 87 *N.J.* at 212; Gobert, "In Search of the Impartial Jury," 79 *J.Crim.L. & Criminology* 269, 301–02 (1988). Notions of jury nullification are appropriately implicated in our recognition that a jury in a capital-murder prosecution may indeed be allowed to consider sympathy for the defendant. *See Ramseur, supra*, 106 *N.J.* at 296–97.

Another argument is based on so-called "residual doubts." A juror may harbor lingering doubt concerning guilt that could be carried into the sentencing phase of the trial and form the basis of a refusal to impose the death penalty. L. Black, *Capital Punishment: The Inevitability of Caprice and Mistake in Administering the Death Penalty* (part I) (1981); *see Heiney v. Florida*, 469 *U.S.* 920, 921–22, 105 *S.Ct.* 303, 304, 83 *L.Ed.*2d 237, 238 (1984) (Marshall, J., dissenting). Such "residual doubt" has been advanced as a protection for defendants that would be lost if the use of a single death-qualified jury in the trial of both guilt and penalty in capital causes were abandoned. *See, e.g., Grigsby v. Mabry, supra*, 758 *F.*2d at 247–48 (Gibson, J., dissenting) (State's interest in a unitary jury system based, in part, on the theory that defendant may benefit from jury's residual doubts.); *Smith v. Balkcom*, 660 *F.*2d 573, 580–81 (5th Cir.1981), modified, 671 *F.*2d 858 (5th Cir.1982) *cert.* den., 459 *U.S.* 882, 103 *S.Ct.* 181, 74 *L.Ed.*2d 148 (1982).

Nevertheless, a capital defendant does not have a constitutional right to require capital juries to consider their residual doubts about guilt in the sentencing phase of the trial. *Franklin v. Lynaugh*, —— *U.S.* ——, ——, 108 *S.Ct.* 2320, 2326–27, 101 *L.Ed.*2d 155, 165–66 (1988). Moreover, as already noted, there are numerous instances where the guilt-phase jury does

not decide the sentence of a capital defendant, and consequently the defendant does not benefit from residual doubt.

In sum, these several objections expressed in terms of juror accountability, nullification, and residual doubt do not severally or collectively overcome the prejudice of conviction-proneness; they do not justify the retention of death-qualified juries to determine guilt. Conversely, the use of death-qualified jurors to determine criminal guilt generates a material risk of jury partiality. It is a consideration that weighs heavily in favor of a multiple-jury procedure for the trial of capital causes.

### D.

Another reason that is advanced to justify the current use of the death-qualified jury is prosecutorial convenience; the State has an interest in a single-jury, sequential or bifurcated trial because it is simpler and easier to try a defendant for capital murder. *See Bey (II), supra,* 112 *N.J.* at 197 (Handler, J., dissenting). Prosecutorial preference for the death-qualified, single-jury bifurcated trial methodology cannot, however, outweigh the defendant's right to an impartial jury. *See id.* at 197–98 (Handler, J., dissenting). Yet, the Court now appears to agree with the Supreme Court's view that prosecutorial convenience can outweigh the defendant's interest in a fair trial by an impartial jury. *See, e.g., Buchanan, supra,* 483 *U.S.* at 417, 107 *S.Ct.* at 2915, 97 *L.Ed.*2d at 352. Rather, the Court should heed Justice O'Hern's earlier observation that "the inconvenience entailed in providing for a non-death-qualified jury—one that is fair and impartial—in the trial of guilt is not too high a price to pay to vindicate constitutional interests." *Ramseur, supra,* 106 *N.J.* at 339–43 (O'Hern, J., concurring).

The convenience that attends the single-jury bifurcated-trial approach simply is not important enough to be continued. The asserted inconvenience of the multiple-jury bifurcated system has to do more with physical and financial demands than procedural complexity. A multiple-jury system may involve

physical adjustments and financial cost. It is a rare situation, however, where these considerations outweigh constitutional interests. *See, e.g., Ballew v. Georgia*, 435 *U.S.* 223, 98 *S.Ct.* 1029, 55 *L.Ed.*2d 234 (1978). As Justice O'Hern so eloquently stated, "[o]urs is a civilization uniquely committed to the value of human life. Our nation does not view the lives of its citizens as easily expendable. We do not measure the value of human life in dollars." *Ramseur*, 106 *N.J.* 123, 342 (O'Hern, J., concurring).

I do not proffer the multiple-jury bifurcated-trial procedure as an alternative to the single, death-qualified jury bifurcated procedure to suggest that under the State Constitution it is required and must be implemented. Rather, the proffer is made to demonstrate that there are viable alternatives that should be explored and can be developed. I would again urge the Court to address Justice O'Hern's concern that "[t]he real question for us is not what the State can do, but rather what we should do in the just exercise of our common law supervisory power over criminal practice within our jurisdiction." *Id.* at 333–34.

## II.

In *State v. Gerald*, we held as a matter of state-constitutional law that before an accused can be convicted of capital murder, the State must prove beyond a reasonable doubt that the defendant purposely or knowingly intended to cause the victim's death. 113 *N.J.* at 69–91. We ruled further that the crime of homicide in which the defendant intended to inflict only serious bodily injury on another—but not death—is *not* capital murder. *Ibid.* It is critical, then, that the jury be given a charge that draws the distinction between one who intends the death of another, and is therefore death-eligible, and one who intends to cause serious bodily injury to, but not the death of, the victim. *See id.* at 91–92.

The majority acknowledges that such a charge was not given in this case. Instead, "the charge instructed the jury that the defendant would be guilty of capital murder if he contemplated causing only serious bodily injury." *Ante* at 376. This charge was reinforced by the verdict sheet, which "did not require the jury to find that the defendant contemplated causing death, rather than serious bodily injury that results in death," in order to reach a verdict of guilty of capital murder. *Ibid.* Nevertheless, the majority concludes that this was "harmless error." I disagree.

Although "not essential to [its] ... disposition," the majority finds that "the evidence is overwhelming that defendant knowingly killed" Edward Lawson. *Ante* at 376. This determination leads the Court to conclude further, albeit tentatively, that the defendant was *not* entitled to a number of jury charges, including a charge on serious-bodily-injury murder. Thus the Court states, "[o]nly in the most tenuous sense would the evidence have supported a charge of aggravated or reckless manslaughter or of intending to inflict serious bodily injury, but not death, on another." *Ibid.* In my view, the Court errs in both its approach to the question of whether the evidence would support a charge for a lesser offense and in its reliance on misleading and irrelevant facts as a basis to conclude that the evidence is overwhelming that defendant knowingly killed his victim.

The Court's analysis in this case is similar to the tack it took in *State v. Rose, supra,* 112 *N.J.* at 479–85. In that case, the defendant was convicted of capital murder and sentenced to death for the fatal shooting of a police officer. On appeal, the defendant alleged that in light of evidence arguably indicating that his actions resulted from panic, the trial court's refusal to charge the jury on aggravated manslaughter constituted reversible error. A majority of the Court, however, relied on the weight of the evidence that the defendant shot the officer in the stomach from very close range with a sawed-off shotgun, that the shooting was witnessed, and that defendant had confessed

to it to conclude that defendant's firing of the shotgun was intentional rather than accidental, and thus found no rational basis for allowing the jury to consider aggravated manslaughter as a possible verdict. *Id.* at 482–83.

As I pointed out in dissent in *Rose,* the Court's approach was indeed novel in that it emphasized the quantum of evidence supporting the greater crime rather than an examination of the record for evidence that would rationally support a jury verdict convicting the defendant of the lesser offense as required by our decision in *State v. Crisantos (Arriagas),* 102 *N.J.* 265, 276 (1986). In essence, the Court constructed a new formulation of the law according to which a "rational basis is not established unless a defendant has not only pointed to evidence that could support a conviction on the lesser charge, but also, and quite apart from this, explained why the jury should have credited that evidence by assailing the strength of the evidence of the greater charge." *Rose, supra,* 112 *N.J.* at 560 (Handler, J., dissenting). I noted further that because the degree to which a jury will believe and weigh evidence is inscrutable, the question of what weight to afford evidence that could be read to support a lesser charge had previously been left to the jury. Rational basis had been established in our prior cases by an existence of slightly more than "a scintilla" of evidence of the lesser charge, not by any assessment of its weight as against the evidence supporting conviction of the greater charge. *Ibid.* I thus concluded in *Rose* that to the extent the majority's approach required courts both to hypothesize the weight a jury would have ascribed to a lesser charge and then assess the weight of that evidence as against the weight of the greater charge in order to determine whether a rational basis exists to charge the lesser offense, "it departs from all precedent, imposes an unrealistic standard, and usurps the function of the jury." *Ibid.*

We see in this case such radical departure from established precedent, as well as the usurpation of the jury function, in the Court's inexplicable failure to examine the record for evidence

sufficient to enable a jury to conclude rationally that the defendant intended to cause serious bodily harm to, but not the death of, his victim. Instead, as it did in *Rose*, the Court concentrates on the "overwhelming" evidence that the defendant intended to kill Edward Lawson. By conducting a weighing of the evidence more appropriate to a jury's deliberation rather than the ascertainment of "rational basis" that is required by *Crisantos*, the Court's analysis illustrates the serious errors that can occur when the Court usurps the jury function.

The damage of such analysis is particularly evident when it is noted that the facts proffered by the majority as "overwhelming evidence" that defendant intended to kill are equally supportive of an intent to inflict serious bodily injury rather than death. Specifically, the fact that after hearing that Lawson had abused his sister, defendant grabbed a knife and said, "I told this motherfucker about fucking with my sister" and "I know what I got to do," is no more indicative of an intent to kill than of an intent to inflict serious bodily injury, particularly when "serious bodily injury" is defined for the jury, as it was in this case, as "bodily injury which creates a substantial risk of death." Moreover, defendant's post-killing statement that "I killed him. I broke the knife in him," is totally irrelevant to defendant's state of mind at the time he committed the homicide; while it does indicate defendant's recognition of the consequences of his actions, it does not even tend to establish that defendant intended to kill at the time of the attack. It could well have been that defendant, having meant to hurt, even seriously hurt Lawson, was merely describing or expressing surprise at the result of his attack. Finally, the wounds inflicted are no more indicative of an intent to kill than of an intent to commit serious bodily injury that creates a substantial risk of death to the victim and that actually results in death.

In this case, the evidence was sufficient to enable the jury to determine that defendant intended to kill his victim. However, there also existed a rational basis for a jury to conclude that defendant intended to cause only serious bodily injury to, rather

than the death of, Edward Lawson. There are no "smoking-gun" statements by the defendant in which he expresses an intent to kill the deceased; nor are the wounds inflicted clearly indicative of anything more than that defendant intended to commit grievous bodily injury on his victim. Hence, there was a sufficient basis to charge serious-bodily-injury murder as this Court defined the offense in *State v. Gerald, supra,* 113 *N.J.* at 69–92.

Nevertheless, the majority professes that it need not base its decision on the perceived insufficiency of the evidence. It concludes rather that "even if the evidence were sufficient, defendant was not prejudiced by the absence of the charges." *Ante* at 377. It observes, simply, that because the defendant is no longer death-eligible due to sentencing errors below, "[t]he net result is that defendant stands convicted of murder, not capital murder." *Ante* at 376.

The court's rationale thus appears to be based on the assumption that the defendant would have benefited from the appropriate charge only to the extent that the jury would have convicted him of non-capital murder, a benefit he has now already secured. But the prejudice is not simply that defendant was deprived of a conviction of ordinary or non-capital murder, prejudice neatly neutralized by rendering him non-death-eligible. The real harm in failing to instruct the jury on serious-bodily-injury murder is that the jury was deprived of the full spectrum of choices on which to base its weighty determination of criminal liability, denying the defendant the opportunity to secure a conviction on a less serious offense, namely, a form of manslaughter.[5]

---

[5]The defendant sought to have aggravated manslaughter charged in the case but the trial court denied this request, permitting only passion/provocation manslaughter to be charged. The majority appears overly concerned with defense counsel's inarticulate request for an aggravated manslaughter charge as well as with other procedural errors. See *ante* at 375. Although such concern would be implicated in ordinary cases where "plain error" analysis is

We have held that at the very core of the guarantee of a fair trial in a criminal case is the judicial obligation to assure the jury's impartial deliberations based solely on the evidence and in accordance with proper and adequate instructions. *State v. Simon,* 79 *N.J.* 191, 206 (1979). When a defendant requests that the jury be instructed on a lesser-included offense, the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if there exists a rational-basis for a verdict convicting the defendant of the included offense. *Crisantos, supra,* 102 *N.J.* at 278. Indeed, "so paramount is the duty to insure a fair trial that a jury must deliberate in accordance with correct instructions even when such instructions are not requested by counsel." *State v. Grunow,* 102 *N.J.* 133, 148 (1986); *see State v. Moore,* 113 *N.J.* 239, 288 (1988) (trial court's failure to charge on diminished capacity constitutes reversible error although charge was never requested by defense counsel). Thus, "the court ordinarily has a supervening responsibility to charge the jury concerning any version of the offense 'clearly indicate[d]' by the evidence to require proper consideration." *Grunow, supra,* 102 *N.J.* at 148 (citing *State v. Choice,* 98 *N.J.* 295, 299 (1985)); *see Ramseur,* 106 *N.J.* at 270–71 n. 62 ("the trial court has a duty 'to charge the applicable law to the jury based upon facts regardless of what requests counsel may make....' "). This duty stems from the belief "that enforcement of the criminal law is too important to be controlled completely by the contentions of the adversaries; and that the court has an obligation to see to it that the jury, as the representative of the public, is given all of the facts *and* all of the possible offenses that might reasonably be found from such facts." *Choice, supra,* 98 *N.J.* at 298–99.

appropriate, such a tack is inconsistent with this Court's "meticulous and comprehensive procedure for reviewing capital cases" and its established belief that "in death penalty cases an appellate court must subject the record to intense scrutiny. The stark fact that a litigant's life is at stake intensifies the obligation of judicial review." *Bey (I),* 112 *N.J.* 45, 93 (1988).

We have held in an anologous situation that charges unsupported by the evidence should not be given to the jury in order to prevent the manipulation of the deliberative process and unwarranted compromise verdicts. Thus, in *State v. Christener*, 71 *N.J.* 55, 69–74 (1976), we held that it is reversible error to instruct the jury on a degree of a crime that is more serious than the evidence will support. We concluded that an instruction on the unsupported charge could subtly influence the jury to infer that the evidence would support the more serious charge and further induce the jury artificially to inflate the weight of the evidence to correspond with the greater crime charged. *Ibid.* Although in *Christener* the jury did not ultimately convict the defendant of the more serious, evidentially unsound, crime of first-degree-murder, we acknowledged the very real possibility that without the greater charge the jury could have found defendant not guilty. *Id.* at 69. The strong, gravitational pull of the unwarranted, first-degree-murder charge may have drawn the jury to a compromise verdict, causing it to settle on the middle ground of manslaughter rather than an acquittal of the defendant. The *Christener* decision, therefore, stands for the proposition that the jury's deliberative process may not be manipulated by the intrusion of unsupported charges. This concern soundly concurs with the overriding principle that the jury's deliberations remain free of extraneous influences and that the jury be fully informed of all significant facts and the full spectrum of charges in order to safeguard the integrity of that deliberative process and the ultimate verdict.

The case before us presents an analgous problem to the one identified in *Christener*. In *Christener*, the erroneous instruction on the greater crime of first-degree murder unduly influenced the jury to inflate the value of the evidence and ultimately increase the seriousness of the crime of which it convicted the defendant. So in this case, the failure to charge a less serious offense that is supported by the evidence could subtly induce a jury to believe that the evidence would support the

more serious offenses; the failure to charge could prevent the jury from deflating the weight of the evidence in order to conform to a lesser charge. What the Court conveniently overlooks here is that the jury might not have so readily rejected the evidence of a form of manslaughter had it been given the appropriate, full range of choices.

It should now be better understood that the lines demarcating certain kinds of homicides are both critically important and extremely fine. The difference between (1) knowing capital murder, *i.e.*, murder committed when one is practically certain of causing death, and (2) knowing serious-bodily-injury murder, *i.e.*, murder committed with practical certainty of causing only serious bodily injury that happens to result in death, and (3) aggravated manslaughter, *i.e.*, a killing committed with a conscious disregard of a substantial risk of death that manifests extreme indifference to the value of human life, is exquisite, and, indeed, may in a given case be so attenuated that a court should rarely if ever withhold from a jury the ultimate responsibility of determining which offense has been committed in light of all of the evidence.[6] In my view, the failure of the trial court to allow the jury to resolve the subtle distinctions between knowing capital murder, knowing serious-bodily-injury murder,

---

. [6]Even the Commentary to the proposed Code revision of 1971, which introduced the concepts ultimately codified as "knowing" murder and "aggravated manslaughter," states that the demarcating line between the two is so fine that whether one charge is implicated over the other in a particular case must be left to the jury's determination. *Rose, supra,* 112 *N.J.* at 563 (Handler, J., dissenting) (quoting New Jersey Penal Code, Volume, II: Commentary, Final Report of the New Jersey Criminal Law Revision Commission, 1971).

It is precisely this blending of knowing murder and aggravated manslaughter that led me to conclude in *Gerald,* as a matter of state constitutional law, that *knowing murder should not be included in the class of death-eligible murders* because of the intolerable risk that reckless murder will also becme capital murder. 113 *N.J.* at 150–53 (Handler, J., dissenting). At the very least, since the two are so similar in definition and mode of proof yet so drastically different in consequence, the jury should be given the opportunity to fit the evidence to the appropriate crime and intelligently choose between them.

and the various forms of manslaughter constitutes reversible error.

We have said in ordinary criminal cases that "it is speculative to forecast what verdict a jury would have returned if properly instructed on the basis of the verdict that a jury returned after an incomplete instruction." *Crisantos, supra,* 102 *N.J.* at 273. This conclusion stems, in part, from our recognition that a criminal jury has the power to convict on a lesser charge although the evidence establishes the greater charge beyond a reasonable doubt. *Id.* at 272 (citations omitted), *see McCleskey v. Kemp, supra,* 481 *U.S.* at 311, 107 *S.Ct.* at 1777, 95 *L.Ed.*2d at 291. Accordingly, the fact that the jury in this case convicted the defendant of capital murder does not necessarily mean that the jury would have convicted the defendant of serious-bodily-injury murder rather than a lessor form of manslaughter if given the full range of available choices. In truth, we do not know what the jury would have done given the appropriate charge, nor should we guess.

I would therefore reverse the defendant's conviction for capital murder and remand for a re-trial on the charge of murder, including both accomplice murder, which was charged below, and serious-bodily-injury murder. In addition, defendant should be given the full opportunity on remand to assert that the evidence presented would support only a form of manslaughter.

### III.

In the penalty phase, the State relied on a solitary aggravating factor, c(4)(c). With respect to this factor the State resorted to the evidence produced during the guilt phase; it did not introduce any additional evidence at the penalty-phase trial. The defendant offered expert testimony to support his contention that he was under extreme mental or emotional disturbance, *N.J.S.A.* 2C:11–3c(5)(a), as well as his own testimony and that of members of his family to establish his devotion to them

and his reliability as a worker under the "catch-all" factor, *N.J.S.A.* 2C:11–3c(5)(h). In his summation, the prosecutor argued that the evidence of twenty-four stab wounds alone was sufficient to support the existence of aggravating factor c(4)(c). However, these remarks failed to point out any evidence from which the jury could infer and determine beyond a reasonable doubt that the defendant intended to inflict gratuitous or added pain and suffering other than that which occurred in the purposeful killing of the victim.

At the close of the penalty phase, the jury found the existence of aggravating factor c(4)(c) in the case as well as four mitigating factors; it nevertheless concluded that the solitary aggravating factor was not outweighed by the mitigating factors.

Our narrowing construction of c(4)(c) in *Ramseur* excised the first part of the statutory definition—that the murder was outrageously or wantonly vile, horrible, or inhuman—and focused exclusively on the second part—that the murder "involved torture, depravity of mind, or an aggravated assault on the victim." 106 *N.J.* at 198–99. We also concluded that the terms "torture" and "aggravated battery" were identical in purpose; both of these factors exist if the defendant "intended to, and did in fact, cause extreme physical or mental suffering—in addition to death." *Id.* at 208. In other words, "the extreme physical or mental suffering must be precisely what defendant *wanted* to occur in addition to death." *Id.* at 208–09.

The trial court here focused preliminarily on whether the murder was "outrageously or wantonly vile, horrible or inhuman," rather than on whether the defendant intended to inflict extreme physical or mental pain on Lawson in addition to death. In so doing, the trial court used the definition that we subsequently found unconstitutional in *Ramseur.* I thus concur in the Court's determination that the erroneous instruction warrants a reversal of the defendant's death penalty.

The Court, however, does not address defendant's contention that the State failed to proffer sufficient evidence that the murder of Lawson involved either "torture" or an "aggravated battery." The Court eschews further consideration of this claim because it rules, for other reasons, that the defendant cannot be again tried for capital murder and exposed to the death penalty. I believe the issue should be addressed. The circumstances of purposeful murder involving multiple wounds and non-instantaneous death are recurrent. *See* Bienen, Weiner, Denno, Allison & Mills, "The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion," 41 *Rutgers L. Rev.* 27,356 (1988) (Study indicating that murder by stabbing is one of the most frequently-employed methods of committing homicide). It behooves the Court to explain whether such evidence is sufficient to enable a jury to conclude beyond a reasonable doubt that the murder is to be regarded as capital murder under c(4)(c).

In my opinion such evidence alone, without additional evidence demonstrating a torturous or sadistic intentional state of mind, cannot suffice as a matter of law to establish the aggravating factor of c(4)(c). We addressed a similar issue in *Ramseur*. There the defendant, after having stabbed the victim and walked away from her, returned within a couple of minutes to inform the bleeding victim that he was going to kill her grandchildren before inflicting the remaining fatal stab wounds. 106 *N.J.* at 288. From that conduct, we found that a jury could infer that "Ramseur, in addition to purposely killing the victim, also purposely inflicted severe mental pain prior to her death." *Id.* at 288.

By contrast, here the only evidence is that Lawson was stabbed twenty-four times, was shocked by the attack, and bled for twenty minutes before dying. The State relies solely on the multiple stab wounds, which the prosecutor described on summation as "24 aggravated batteries," to establish aggravating factor c(4)(c). Nothing, however, suggests that defendant intended anything but to kill Lawson; there is no evidence that

defendant intended to torture Lawson or needlessly to prolong his death in order to add to his pain and suffering or to inflict unnecessary or gratuitous severe pain in addition to death. Although those wounds doubtless caused the victim to suffer extreme psychological and physical pain, nothing inferable from the manner in which the wounds were inflicted or the nature of the wounds themselves or the defendant's state of mind indicates that defendant intended to inflict any pain except that which occurs inevitably when murder is accomplished by stabbing and death is not instantaneous or sudden.

If the c(4)(c) factor could be sustained in this case, where the only evidence is several non-fatal wounds and death was not instantaneous, there would be "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey v. Georgia*, 446 *U.S.* 420, 433, 100 *S.Ct.* 1759, 1767, 64 *L.Ed.*2d 398, 409 (1980). We said as much in *Ramseur.*

[T]he essence of the Legislative concern is the defendant's state of mind. We do not believe that the Legislature intended to distinguish between two murderers each of whom intended to inflict immediate death upon the victim without any additional suffering whatsoever, when one victim dies immediately and the other lives for a long period of time and experiences excruciating pain. That capricious event alone would be perceived as an insufficient basis on which to inflict death on that defendant while imposing imprisonment on the other. [106 *N.J.* at 207.]

As reprehensible as it is, a multiple stabbing in itself, without anything more, is insufficient to sustain a finding beyond a reasonable doubt that a defendant intended to inflict, in addition to death, extreme physical or mental pain on his victim.

I would therefore hold that there was insufficient evidence to support submission of factor c(4)(c) to the jury. *See Rose, supra,* 112 *N.J.* at 531 (evidence was insufficient to support the submission of factor c(4)(c) to the jury because "[a]side from evidence that defendant had fired the shotgun and was knowledgeable about its capacity to inflict devastating injury, there was no proof that defendant's intention was to cause [the victim] pain and suffering, rather than to kill him.").

## IV.

In conclusion, I find the continued use of death-qualified juries to try the issue of criminal guilt in a capital trial to be a fatal infirmity in our capital-murder statutory scheme. The Court at the very least should conscientiously undertake to modify this procedure and to explore alternatives. Further, I find that reversible error was committed in this case in the failure of the trial court to charge serious-bodily-injury murder as defined by *State v. Gerald.* The defendant's murder conviction, in my opinion, should therefore be reversed. Finally, I believe the Court should determine in this case that the evidence was insufficient to establish beyond a reasonable doubt the aggravating factor of c(4)(c).

Therefore, I write separately to express these reasons and to record my dissent.

*For affirmance in part; reversal in part; remandment* —Chief Justice WILENTZ and Justices POLLOCK, CLIFFORD, O'HERN, GARIBALDI, and STEIN—6.

*For reversal*—Justice HANDLER—1.